**LAKER AIRWAYS LIMITED, Plaintiff,**

v.

**PAN AMERICAN WORLD AIRWAYS, et al., Defendants.**

**LAKER AIRWAYS LIMITED, Plaintiff,**

v.

**SABENA, BELGIAN WORLD AIRLINES, et al., Defendants.**

Civ. A. Nos. 82–3362, 83–0416.

United States District Court, District of Columbia.

March 9, 1983.

Robert M. Beckman, Beckman & Farmer, Carl W. Schwarz, Metzger, Shadyac & Schwarz, Washington, D.C., for plaintiff.

Fred D. Turnage, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for Pan American World Airways.

Leonard N. Bebchick, Douglas E. Rosenthal, Sutherland, Asbill & Brennan, Washington, D.C., for British Caledonian Airways.

James J. Murphy, Bryan, Cave, McPheeters & McRoberts, Washington, D.C., for McDonnell Douglas Corp., McDonnell Douglas Finance Corp.

George T. Manning, Chadbourne, Parke, Whiteside & Wolff, Washington, D.C., for Trans World Airlines.

Lloyd Cutler, Wilmer, Cutler & Pickering, Laurence A. Short, Short, Klein & Karas, Washington, D.C., for Lufthansa German Airlines, Swissair, Swiss Air Transport Co. Ltd.

Sidney S. Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., William C. Clarke, Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for British Airways Bd.

Peter J. Nickles, Covington & Burling, Washington, D.C., for Sabena, Belgian World Airways.

Thomas J. Whalen, Condon & Forsyth, Washington, D.C., for KLM Royal Dutch Airlines.

Bert Rein, P.C., Kirkland & Ellis, Washington, D.C., for International Air Transport Assn.

OPINION

HAROLD H. GREENE, District Judge.

This is an antitrust action brought by Laker Airways against a number of American and foreign airlines. Presently before the Court is plaintiff's motion for a preliminary injunction. Because of the apparently unprecedented circumstances which gave rise to this application,[1] it is appropriate to recite the background of the lawsuit in some detail.

I

On November 24, 1982, Laker Airways Limited (Laker)[2] brought an action in this Court under the Sherman Act (15 U.S.C. §§ 1 and 2) and the Clayton Act (15 U.S.C. § 15) against Pan American World Airways, Inc. (Pan American), Trans World Airlines Inc. (TWA), McDonnell Douglas Corporation (McDonnell Douglas), McDonnell Douglas Finance Corporation (McDonnell Finance), British Airways Board (British Airways), Deutsche Lufthansa Aktiengesellschaft (Lufthansa), Swiss Air Transport Company Limited (Swissair), and British Caledonian Airways Limited (British Caledonian). On February 15, 1983, a separate action, containing essentially the same allegations as those recited in the November 1982 complaint,[3] was brought by Laker against Sabena Belgian World Airlines (Sabena) and KLM Royal Dutch Airlines (KLM).

The complaints allege the following.

Since 1946 the fares for scheduled air transportation have been set by the International Air Transport Association (IATA), an association of the world's major airlines,[4] at levels higher than would prevail in a competitive market. Laker began charter flight operations between Great Britain and the United States in 1970, and, starting in June 1971, it also began to seek permission to operate low-cost "Skytrain" transatlantic service. Resistance from the IATA airlines delayed implementation of the scheduled service until September 1977, but eventually Laker was able to provide every week over forty scheduled flights[5] at low fares, in addition to extensive charter service between the United States and Great Britain. Prior to the advent of Laker's Skytrain service from London to New York, which cost $115, the IATA-fixed economy fare on the same route was almost three times as much, or $313.

The complaints further allege that, in response to Laker's low-fare service, the IATA airlines agreed on a predatory scheme to destroy both Laker's transatlantic charters and its Skytrain service.[6] In execution of that scheme, some of the IATA airlines offered their services on the New York-London route at below cost, expecting to drive Laker out of business, and expecting further that, once Laker was gone, they could and would raise their fares again to their previous high levels or above. In short, the complaint alleges a classic antitrust conspiracy.

1. See pp. 1129–1131 *infra*.

2. Laker Airways Limited is a subsidiary of Laker Airways (International) Limited, which in turn is controlled by Sir Freddie Laker.

3. In view of the fact that the cases appear to present similar or related issues of fact and law, and in the interest of judicial economy, the Court will consolidate the two actions unless one or more of the parties shows sufficient cause within five days of the date of this Opinion why such consolidation should not be effected.

4. IATA includes Pan American, TWA, British Airways, Lufthansa, Swissair, British Caledonian, KLM, and Sabena.

5. This service employed the widebodied jets typically used by the major airlines for transatlantic flights.

6. It is alleged that the airlines based in continental Europe participated in this scheme because many of their passengers travelled to the United States via London in order to benefit from Laker's low fares, bypassing the European airlines' direct service to the United States.

Plaintiff further claims that although the conspiracy did not bear fruit at first,[7] by 1981 Laker was so weakened by defendants' predatory activities and by a substantial drop in the dollar value of the pound sterling that it could not afford to reduce its fares further so as to compete with the fares adopted by defendants on some of Laker's routes. In October 1981, Pan American, TWA, and British Airways, seeking to end Laker's low-fare competition once and for all, decided to offer their own attractive, high-cost services at Laker's low prices on all of Laker's routes.[8] Subsequently, in the winter of 1981–82, the IATA met in Switzerland and in Florida to agree on a program to set new and higher fares for the spring and summer of 1982, but to fix the fares of IATA members at Laker's level as long as Laker was in business.[9]

According to the complaint, the defendants also interfered with Laker's financing. By Christmas 1981, Laker had reached an agreement with its lenders for the financial support made necessary by its weakened condition. The IATA members thereupon successfully pressured Laker's lenders to deny Laker that financing, and on February 5, 1982, succumbing to this pressure, Laker was forced into liquidation.

It was in response to these alleged activities that Laker filed the instant actions in this Court.

## II

The first lawsuit proceeded in its normal course from November 24, 1982 to January 21, 1983. On that date, with no challenge to jurisdiction having been raised in this Court by any of the defendants, British Airways filed a declaratory judgment action against Laker filed in the Queen's Bench Division of the High Court of Justice in England [10] seeking a declaration of non-liability to Laker and a permanent injunction preventing Laker from continuing with its suit against British Airways in the United States. At the time of the filing of its complaint, British Airways also applied for and was immediately granted an injunction against interference with the conduct of the British court proceedings.[11] Within hours, British Caledonian, Lufthansa, and Swissair filed similar writs against Laker in the British court, and they likewise applied for, and were granted the identical injunction against Laker's seeking a counterinjunction.

Mr. Justice Parker of the Queen's Bench Division set a hearing for March 21, 1983, at which it is to be determined whether Laker should be permanently enjoined from proceeding with its lawsuit in this Court against both British airlines on the basis that Great Britain is the more appropriate forum.[12]

However, subsequently, by an order dated March 2, 1983, the British court all but

7. Until 1981 Laker was showing a profit.

8. By then, Laker offered service from three cities in the United Kingdom to four cities in the United States.

9. The meetings are referred to only in the complaint in No. 83–0416, the action against KLM and Sabena, but in that pleading plaintiff alleges that all of the IATA defendants participated in the meetings.

10. The previous November 29, five days after Laker's first complaint was filed here, Midland PLC (Midland) had filed a declaratory judgment action in Britain against Laker, having been informed that Laker was considering joining Midland as a defendant in the U.S. action. This action is presently proceeding to trial. Midland hopes to prove facts that show that it could not have been involved in any conspiracy against Laker "under American Law, Anti-trust or otherwise, or English law." Transcript of judgment, February 4, 1983. The British court

has described Laker's assertions of Midland's complicity as "inherently unlikely." Transcript at 14.

11. Plaintiff had two hours notice of this application. The injunction restrains Laker, its liquidators, and their agents from attempting to obtain a counterinjunction that would prevent British Airways from proceeding with the British action. The factual basis for the injunction is not clear. No one had apparently even thought of obtaining a counterinjunction, if only because presumably no one knew or suspected that British Airways, not having challenged the jurisdiction of this Court in this Court, would do so elsewhere.

12. After the issuance of the first British injunction on January 21, 1983, the remaining four defendants in C.A. No. 82–3362—TWA, Pan American Airways, McDonnell Douglas Corp., and McDonnell Douglas Finance Corp.—were enjoined by a temporary restraining order is-

decided this question at least with respect to British Airways and British Caledonian. That order, issued without a hearing and without any notice to plaintiff or to this Court, enjoins Laker from "taking any further steps in Civil Action 82–3362 [in this Court]" against the two British defendants.[13] The March 2 order, if valid, would preclude plaintiff from filing applications or motions in this Court, oppositions to motions filed by the defendants, and any other pleadings or papers.[14]

The British court has indicated that it will decide at a later date the appropriateness of a permanent injunction at Lufthansa's and Swissair's urging, and that it will also hold trials on the merits of the claims that the airlines are not liable to Laker. In passing on these claims, the court apparently intends to decide issues of American antitrust law as well as of British law.[15]

The papers filed in the British court, which have been forwarded to this Court by various parties [16]—indicate [17] two bases for

sued by this Court from participating in the English lawsuit. Subsequently, KLM and Sabena were similarly made subject to a TRO. Five days ago, on March 4, 1983, a hearing was held on plaintiff's motions for a preliminary injunction and for partial summary judgment with respect to the issue of *forum non conveniens*. Inasmuch as not all of the parties agreed to an extension of the TRO until such time as the Court might be able to make a decision on the preliminary injunction in due course, that decision was issued on March 7, 1983. This Opinion details the reasons for the issuance of the injunction.

The Court will decide the motion for partial summary judgment at a later date, and it may further supplement this Opinion at that time. The Court does not envision that its decision on the summary judgment motion will be long delayed, contrary to the prediction made in affidavits submitted to the British court on January 25, 1983. It is worth noting that while the airlines complained in the British court about an expected delay here, in their opposition to plaintiff's motion for partial summary judgment filed in this Court they urged a delay in the ruling on that motion.

**13.** The order contradicts statements made to Mr. Justice Parker by English counsel for Lufthansa, back in January, that the British injunction "does not and has never been intended to stop the flow of proceedings in the United States."

**14.** The British court appears to have rationalized its action on the ground that its injunctions operate only on the plaintiff, not this Court. See Transcript of proceedings, February 4, 1983, pp. 5–6. At least in this country, as the Supreme Court held over a century ago, there is no difference between addressing an injunction to the parties and addressing it to the foreign court itself. *Peck v. Jenness*, 48 U.S. (7 How.) 612, 624–625, 12 L.Ed. 841 (1849). See also, *Compagnie des Bauxites de Guinea v. Insurance Company of North America*, 651 F.2d 877, 887 (3d Cir.1981). Mr. Justice Parker has also stated (Transcript of proceedings, January 27, 1983, p. 3) that the type of injunction he issued "does not represent an

interference by one court with the proceedings of another." With utmost respect, this Court must differ. It can hardly be said that an order which, for example, directs a party not to file further papers in this Court, as did the order of the British court of March 2, is anything other than a direct interference with the proceedings in this Court. The orders secured by the defendant airlines on January 21, 1983, have a like effect.

**15.** Mr. Justice Parker said with regard to the *Midland* case (see note 10 *supra*) that "the declaration [is], on its face, in very wide terms and appears to involve an English court deciding on American law, and in particular on American Anti-Trust law." Transcript of judgment, February 4, 1983, p. 11.

**16.** By order of the British court, all the papers filed there, including the transcripts of the hearings and the court's decisions, are to be kept confidential, and this Court was advised of this confidentiality order by those who at various times forwarded the papers to it. This Court did not seek or request these documents which came to it on an entirely unsolicited and haphazard basis. In any event, it is the law in the United States that, except in unusual situations such as those involving well-defined national security matters or particular trade secrets, the public is entitled to access to what is happening in the courts, for the courts' business is the public's business. See *Richmond Newspapers v. Commonwealth*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

For that reason and in fairness to the British court, this Court wants to make it clear that, if additional materials regarding these proceedings may be forwarded to this Court, it will not regard itself as bound by confidentiality requirements to the extent that the British documents bear on the proceedings here. Such requirements would be at odds with the public's right to know what is occurring in United States courts, especially in an extraordinary case such as this.

**17.** See note 17 on p. 1129.

the extraordinary action of the British tribunal: (1) Laker is incorporated in Britain and for that reason it may and in these circumstances should be restrained from suing in the United States courts, and (2) because of the way the American legal system is structured, it is unlikely that the defendants can receive justice here.

## III

The Court must decide whether to issue a preliminary injunction against the four American defendants and Sabena and KLM.[18] The Court will consider first the question whether it is likely that plaintiff will prevail on the merits of its permanent injunction request,[19] and thereafter (in Part VI) it addresses the relative balance of injuries and the public interest.[20]

■ First. If the British court is proceeding on the assumption that, because Laker is a British corporation, it may not, under American law, sue in the courts of the United States[21] to vindicate rights under the American antitrust laws,[22] it would be mistaken. See *Pfizer Inc. v. India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). As the Supreme Court there said:

> The fact that Congress' foremost concern in passing the antitrust laws was the protection of Americans does not mean that it intended to deny foreigners a remedy when they are injured by antitrust violations. Treble-damages suits by foreigners who have been victimized by antitrust violations clearly may contribute to the protection of American consumers.

434 U.S. at 314, 98 S.Ct. at 588.

■ Second. Except in unusual, very narrow circumstances, there is no basis—at least not in a free country—for precluding a citizen by an injunction-type order from suing in the courts of another nation. A number of courts have repeated in dicta the proposition that a court "has the power to enjoin a party over whom it has personal

---

It is obviously difficult for all concerned—including the British Court and this Court—to conduct proceedings such as these where the information imparted to one tribunal does not always precisely correspond to that which is made known to the other. If, therefore, reference needs to be made here to the proceedings in Great Britain, this Court would prefer that it be done on the basis of a precise record available to all, just as this Court believes that Mr. Justice Parker should be furnished with, and be allowed to use in every way, a transcript of all that transpires in this Court that has any relationship to the proceedings in the United Kingdom. Certainly, the suggestion by the British court (Transcript of proceedings, January 27, 1983, p. 2) that an affidavit that was used there should not have been disclosed to this Court, if followed by both courts with respect to all proceedings and documents, could only aggravate an already difficult situation, fraught as it is with possible misunderstandings.

This Court has given instructions that copies of all transcripts of proceedings here, all orders and decisions, and all documents filed with the Court which bear on the proceedings in Great Britain shall be transmitted to Mr. Justice Parker. Of course the British court may make any use that it wishes of these papers, including their publication as part of an official record.

17. Since the British court, in accordance with custom in the United Kingdom, did not issue a written opinion, its reasoning must partly be discerned from its colloquies with counsel and the transcripts of its judgments, delivered orally.

18. The four airlines before the British court are not affected by the present injunction proceedings.

19. As in many cases, the preliminary injunction in large part decides the merits. Nevertheless, the parties may, if they wish, have their claims considered again on the basis of additional evidence.

20. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977); *Virginia Petroleum Jobbers Assn. v. Federal Power Commission*, 259 F.2d 921 (D.C.Cir.1958).

21. See, *e.g.*, the memorandum of KLM in opposition to the motion for preliminary injunction which contends (at p. 11) that "there is grave doubt" that the American antitrust laws can be given extraterritorial effect so as to encompass "the injury to Laker, a U.K. company."

22. Until its insolvency, Laker was, of course, daily engaging in business in the United States, and so were and are all of the defendants in this action. Defendants' business activities, including any alleged antitrust violations, had an intended effect upon American commerce, and hence defendants are subject to United States antitrust law. See, *e.g.*, *In re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir.1980).

jurisdiction from pursuing litigation before a foreign tribunal." *See, e.g., Western Electric Co. v. Milgo Electronic Corp.,* 450 F.Supp. 835, 837 (S.D.Fla.1978). The power is rarely exercised, however, for "[r]estraining a party from pursuing an action in a court of foreign jurisdiction involves delicate questions of comity and therefore 'requires that such action be taken only with care and great restraint.' *Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.,* 412 F.2d 577, 578 (1st Cir.1969)." *Compagnie dex Bauxites de Guinea v. Insurance Company of North America, supra,* 651 F.2d at 887 n. 10 (3d Cir.1981). Indeed, when one examines the reported instances in which this power has actually been used, one finds that the fact situations are quite different from those involved in the instant cases.

In *Medtronic, Inc. v. Catalyst Research Corp.,* 518 F.Supp. 946, 955–56 (D.Minn. 1981), the court issued an injunction directed at proceedings in Germany and Canada (1) only after taking pains to emphasize that its order merely prevented the foreign courts from awarding a form of relief—an injunction—that is not an issue on the merits in the lawsuit before this Court,[23] and (2) by noting that the dispute between the parties was based on a contract between them that could be construed to forbid the foreign plaintiff from seeking injunctive relief against the United States plaintiff. Needless to say, here no similar contractual relationship exists between the parties, and the injunction proposed to be issued by the

British court would abort all aspects of Laker's lawsuit.

In another case cited by defendants, *Harvey Aluminum, Inc. v. American Cyanamid Co.,* 203 F.2d 105 (2d Cir.1953), the Court of Appeals stated that it was of the opinion that the District Court could enjoin prosecution of an action in British Guinea if that action had been filed purely out of vexatiousness, but that if the plaintiff had a legitimate reason to be in the British Guinea court on account of British Guinea law, the injunction should not issue.

In *Velsicol Chemical Corp. v. Hooker Chemical Corp.,* 230 F.Supp. 998 (N.D.Ill. 1964), the court stated that it would be inclined to issue an injunction solely to ensure the finality of its judgment, that is, to prevent a losing plaintiff from initiating proceedings abroad against the same defendant on the same cause of action. Similarly, in *Bethell v. Peace,* 441 F.2d 495 (5th Cir.1971), a Florida court enjoined a Florida resident from proceeding with a previously filed lawsuit in the Bahamas involving a contract concerning Bahamian land against Florida residents. Like in *Velsicol Chemical,* the injunction constituted an effort to make conclusive the court's judgment.[24] This is wholly different from the instant cases, which (1) implicate a key statute of the United States; (2) involve alleged conduct that in part occurred and had significant effects in the United States; and (3) do not concern the enforcement of an existing British judgment.[25]

---

**23.** The Court's order allowed the foreign suits to proceed by their normal course in all other respects.

**24.** Moreover, the injunction was upheld because the lawsuit involved "the validity of a contract signed in Florida by Florida residents," 441 F.2d at 498, and which was based on fraud.

**25.** There is obviously a large difference between enforcement of a judgment and interference with an ongoing action so severe that a judgment could never be obtained. American courts occasionally stay proceedings before them that are duplicative of proceedings pending elsewhere, but this occurs when the foreign proceeding was filed first, *see Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed.

761 (1950), and when "the expected foreign judgment would be entitled to enforcement in the forum." Ehrenzweig, Conflict of Laws § 36, at 129. Clearly Laker filed his lawsuit first in this Court, and it is entirely inappropriate to suggest that a court of the United States should stay or otherwise abandon a proceeding brought under the Sherman Act to wait to see how another nation's courts would handle the same allegations. Ehrenzweig states that the British courts generally do not stay their proceedings *pendente lite,* because of their "preference for their own courts." *Id.,* § 36, at 127. In this case, the British court is being asked not simply to disregard the first-filed suit, but to ensure that its later-filed proceedings are the *only* proceedings between the parties.

Finally, in *Cole v. Cunningham,* 133 U.S. 107, 10 S.Ct. 269, 33 L.Ed. 538 (1890), a Massachusetts court enjoined a creditor of a Massachusetts insolvent from proceeding with an attachment action in New York. The creditor's action was an intentional circumvention of the Massachusetts laws regarding insolvency, not that much different from defendants' deliberate avoidance of American substantive and procedural law by their resort to the British courts. The holding is thus supportive of plaintiff's position rather than defendants'.[26]

In short, the precedents cited by defendants differ factually in significant respects from the cases now before this Court. For that reason, and because of the breadth of the interference with United States law, ongoing court proceedings, and United States public policy, the injunction proposed to be issued by the British court is truly unprecedented by American standards.[27]

■ Third. In addition to the circumstance that the American precedents would not support issuance of an injunction on the facts presented to Mr. Justice Parker, there is the perhaps even more significant fact that there are so few instances where any court, either in the United States or the United Kingdom, has asserted the power to enjoin its citizens from suing in the courts of another nation. The minimum lesson one can draw from this paucity of precedent is that, if a court has the authority to prevent a national from suing elsewhere, it may exercise this power only in the most extraordinary circumstances.[28]

Yet there is nothing extraordinary about the suits brought in this Court by Laker. They are the garden-variety type of antitrust suit, involving what is claimed to be a combination of American corporations and foreign corporations doing substantial business in the United States which allegedly committed anticompetitive acts. In this age of multinational corporations, ever closer trade relations among the nations, instant communications, and air carriers

---

**26.** Defendants also cite *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), the case upholding the actions of President Carter in extinguishing claims against Iran pending in United States courts and referring them to an international tribunal. These actions were taken as part of an executive agreement negotiated with Iran to free Americans who had been taken hostage there. At issue was the power of the Executive Department, not that of a court, to decide where American nationals might bring suit. The President's actions were taken, moreover, after the declaration of a national emergency implicating the foreign policy of the United States. As the Supreme Court noted, its holding was a narrow one; it did not "attempt to lay down ... general 'guidelines' covering other situations not involved here." 453 U.S. at 661, 101 S.Ct. at 2977. It held that "where, as here, the settlement of claims has been determined to be a necessary incident to the resolution of a major foreign policy dispute between our country and another, and where, as here, we can conclude that Congress acquiesced in the President's action, we are not prepared to say that the President lacks the power to settle such claims." 453 U.S. at 688, 101 S.Ct. at 2991. The holding has no bearing on the question of when a court, acting on its own, should exercise its injunctive powers to direct a national where to sue, or, more accurately, where not to sue.

**27.** To be sure, a British court is governed by British law, and the defendants cite a recent British case in which injunctive procedures were used. See *Smith, Kline & French Laboratories Ltd. v. Bloch,* 1980 S. No. 6514 (C.A. May 13, 1982). It may be noted that *Bloch* enjoined American proceedings having to do with actions that took place in Britain, not between Britain and the United States or in the United States. Moreover, the action was clearly based on a contract. When plaintiff's American counsel discovered that his client had previously assigned his rights under the contract, a second complaint sounding in antitrust was filed in the hope that an antitrust claim would survive the assignment. In contrast, in these cases Laker alleges antitrust violations of a primary and significant form, and the actions would therefore not be governed by *Bloch* with its peculiar facts. For these reasons, among others, it appears that with respect to the instant cases there may be no significant difference between British and American law, and it is not necessary therefore at this juncture to contemplate the outcome in the event of an ultimate irreconcilable conflict between the two legal systems with respect to these cases.

**28.** Mr. Justice Parker has expressed his own view that an injunction by what might be called the "nationality" court against litigation elsewhere would be a "rare case." Transcript of proceedings, January 27, 1983, p. 4.

closely binding the continents together, it is not at all unusual that activities of the kind here alleged should be claimed to have occurred in some instances. In short, there is nothing either unusual or vexatious[29] about the lawsuits brought in this Court.[30]

Thus, if these lawsuits may be singled out for the extraordinary remedy of an injunction requiring a national to cease prosecuting this action, then a great many other lawsuits on both sides of the Atlantic, in the field of antitrust law as in many other fields, would qualify for similar treatment.[31] To put it another way, any decision which accepted the proposition that the court of the plaintiff's nationality may interfere with and effectively halt proceedings abroad in circumstances such as those involved here would set a far-reaching and dangerous precedent.

American companies operate, directly or through subsidiaries, in many countries all over the world, sometimes on a massive scale.[32] Under the rationale which under-lies the lawsuit in Great Britain, and which has at least provisionally been accepted by the British tribunal,[33] American courts could legitimately interject themselves, by means of injunctions, between those American corporations and the foreign courts, and the courts of nations other than the United States and the United Kingdom could, and no doubt would, do likewise. The consequences to international trade and to amicable relations between nations that would result from this kind of interference are difficult to overestimate.[34]

▪ Fourth. As concerns defendants' contention that the American courts are unable to do justice, the theory appears essentially to be that the discovery process established by American law is too expensive.[35] Debates have been going on for sometime in the American legal profession as to whether pretrial discovery is, on balance, beneficial because it removes the element of surprise from litigation and contributes to fairer trials and fairer settle-

---

29. This is also demonstrated by the fact that the Justice Department independently empanelled a grand jury to consider the questions that are raised in these lawsuits. See note 49 *infra.*

30. For that reason, there is somewhat of an Alice-in-Wonderland flavor to the arguments made by defendants both in the British court and in this Court. In both places, some of the defendants proceed as if clearly and without question the British court has jurisdiction—notwithstanding its own statement that interference with a suit pending elsewhere would be a rare, or exceptional case—and as if this Court, somehow, were an interloper for continuing to proceed with an action that is regularly pending before it, without any challenge to its jurisdiction having been made and without anything out of the ordinary having occurred until some of the defendants suddenly secured an order from a foreign court. See also note 41 *infra.*

31. It would be naive to expect that, were this kind of precedent to be set by the British court in these cases, other parties and other courts both in Great Britain and the United States would not follow suit.

32. Of course, companies chartered by other nations (*e.g.,* Japan, Germany, France) do business on a similar scale in the United States and elsewhere.

33. The court has indicated its view that the Laker controversy may "be one of the rare cases where a court in this country would restrain a defendant [Laker]." Transcript of proceedings, January 27, 1983, p. 20.

34. Another practical factor militating against use of the "nationality" rule proposed by the defendants comes readily to mind. What about multinational corporations? If such a corporation brought suit in the courts of nation X, and if its affiliates or subsidiaries were incorporated in countries A, B, and C, the courts of which nation would have control over the lawsuit? Under the customary rule, the courts of nation X decide on their own jurisdiction, both in the broadest and in the more narrower *forum non conveniens* sense. Under the rule advocated by defendants, presumably any of the three, four, or more nations in which the corporation may be regarded as a national would have the authority to halt the lawsuit in nation X in its tracks. The impracticability of the rule and its propensity for mischief are apparent.

35. Also referred to in various papers are the differences between the American and British rules respecting attorney's fees, the availability of jury trial, and the American treatment of antitrust defendants as jointly and severally liable.

ments by revealing evidence that might otherwise not be available, or whether it is detrimental because of its cost. Whatever may be the answer to that question,[36] it is hardly the proper province of a foreign court to prohibit the conduct of litigation here because it does not agree with the way in which the United States Congress and the American courts, including the Supreme Court, have dealt with this particular procedural problem.

Again, if that were a proper standard in the British courts, it would also be appropriate for the American courts and the courts of other nations to take like factors into account in determining whether they should interfere with litigation abroad. There are few nations which measure up to the elaborate safeguards guaranteeing fairness that one finds in the United States Constitution and laws. Under the rationale upon which the British proceedings involving Laker and the other airlines are thus predicated, injunctions against foreign proceedings involving American citizens or corporations could become commonplace in the courts of this country whenever a United States court regarded the foreign country's procedures as inadequate.

What is perhaps even more surprising than the denigration of American law by British courts [37] is that very large and reputable American law firms which routinely proceed under, and whose clients daily ben-efit from, the American discovery rules, would send their English solicitors into a foreign court to seek to enjoin proceedings in the United States on the ground that American courts cannot, under American legal procedure, be expected to do justice.[38] The argument based on the expense of litigation in this country is especially strange when it is advanced on behalf of many of the largest airlines in the world represented by these vast and, no doubt, expensive law firms against a plaintiff which is insolvent.

■ Fifth. While two of the defendants are British, four of the other corporations are American and four are carriers chartered in continental Europe. It is difficult to visualize on what basis a British court could legitimately take jurisdiction—let alone displace the jurisdiction of a United States tribunal—where the complaint alleges violations of American law by American corporations and by foreign corporations which provide air service between the United States and Rotterdam, Brussels, Frankfurt, and other cities of continental Europe.[39] The arguments of the European defendants distill down to the proposition that continental Europe is closer to Britain than to the United States.[40] This is hardly a distinction that may be thought to make a difference in an era of multinational corporations and instant communications, especially when it is the parties' business to

36. A proposed amendment to Fed.R.Civ.P. 26(b)(1) would allow a court, on its own initiative or pursuant to motion, to limit discovery if "the discovery is unduly burdensome or expensive, given the needs of the case, the amount in controversy, the parties' available resources, and the values at stake in the litigation." See also *Dolgow v. Anderson,* 53 F.R.D. 661, 664 (E.D.N.Y.1971) (Weinstein, J.) ("court has duty, of special significance in lengthy and complex cases ..., to supervise and limit discovery to protect parties and witnesses from annoyance and excessive expense").

37. Lord Denning, Master of the Rolls, stated in *Bloch, supra,* that, "As a moth is drawn to the light, so is a litigant drawn to the United States. If he can only get his case into their courts, he stands to win a fortune." Mr. Justice Parker, after noting that a particular exhibit "savours of either fiction or journalism rather than legal exposition," added that the exhibit "was apparently prepared by Laker's American attorneys." Transcript of proceedings, February 4, 1983, p. 6.

38. The English solicitors were armed with lengthy affidavits from the American lawyers detailing the claimed inadequacies and injustices of the American system of laws.

39. Britain is not involved in this service.

40. Additionally, defendants KLM and Sabena argue that the Court may not enter any injunction against them because they are owned by foreign governments. There is, of course, a significant difference between a sovereign's public and its commercial activities. In any event, this issue has not been developed either factually or legally, by adequate briefing or otherwise, and it is more appropriate for subsequent consideration.

provide frequent commercial air service between Europe and America. ·

Sixth. This Court does not know what evidence of antitrust violations will be adduced at trial. As noted, the complaint alleges a conspiracy involving both the American and the foreign carriers to violate the American antitrust laws with respect to their operations between Europe and the United States. Nevertheless, it would not be surprising if the effective elimination from the lawsuit of several of the defendants could cripple plaintiff's lawsuit. Furthermore, if that elimination through the action of the British court were to succeed, a precedent would be set that would be likely to undermine the effectiveness of the antitrust laws whenever multinational or foreign corporations are part of the anticompetitive scheme: a court somewhere in the world could surely always be found to issue orders similar to those sought from the British court in these cases to abort an ongoing antitrust action in this country.

## IV

The defendants argue with considerable emphasis that the British court has an interest in deciding whether a British plaintiff may prosecute a lawsuit in a foreign court.[41] Assuming that such an interest exists—as discussed *supra*, at least in the United States and in Great Britain any power based on such an interest is exercised only in very narrow circumstances—it cannot displace the Court's authority and duty[42] to entertain and decide the instant lawsuits.[43]

These actions were brought under a positive command of a crucial American statute that represents a very strong public policy. Indeed, the Sherman Act has frequently been called the charter of economic freedom and its role has been compared to that which the Bill of Rights plays with respect to personal freedoms. See *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1134–35, 31 L.Ed.2d 515 (1972). The duty of this Court to entertain the present actions is buttressed by the constitutional mandate which guarantees to all those residing or doing business in the United States, such as Laker, due process and the equal protection of the laws. See, *e.g., Plyler v. Doe,* 457 U.S. 202, 212, 102 S.Ct. 2382, 2392, 72 L.Ed.2d 786, 796 (1982); quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). See also, *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 489, 51 S.Ct. 229, 231, 75 L.Ed. 473 (1930).[44]

In the end, then, what is involved in this unfortunate controversy is the question whether greater weight ought to be accorded in cases of conflicting claims of jurisdiction to the nationality of the plaintiff or to the substantive law and the substantive public policies of the nation in whose courts the plaintiff brings the action. That question, moreover, must here be decided in the context of a factual situation where all the defendants were and still are substantially engaged in doing business in the United States; where certain of the acts allegedly committed in furtherance of the illegal con-

---

**41.** That is not to say that all defendants make the identical arguments, approach the subject of the current motions with the same decree of sophistication, or claim for the British court the same decree of supremacy. Some of them (*e.g.,* Lufthansa) recognize the existence of several significant operative factors; others (*e.g.,* Sabena) content themselves with ignoring the interests of plaintiffs under American law and the legitimate authority of the American courts, evidently in the belief that these interests and that authority can thereby be made to vanish.

**42.** See *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821).

**43.** This case contrasts with *Cole v. Cunningham,* 133 U.S. 107, 134, 10 S.Ct. 269, 278, 33 L.Ed. 538 (1890), in which there was "[nothing] in the law or policy of [the state of the first-filed, enjoined action] opposed to the law or policy" of the state of the second-filed case.

**44.** See also, the treaty entered into between the United States and Great Britain during the tenure of President Madison which provides that "[g]enerally, the merchants and traders of each nation respectively shall enjoy the most complete protection and security for their commerce but always subject to the laws and statutes of the two countries respectively." 8 Stat. 228 (1815).

spiracy occurred in the United States;[45] where only in the United States can all the defendants surely be reached;[46] and where, if the British court enjoins the plaintiff with respect even to some of the defendants, it may be impossible to prove the conspiracy against any of them.

But these are matters to be explored more fully at other stages—perhaps on the motion for partial summary judgment on the *forum non conveniens* issue. The immediate question is whether this Court shall have the opportunity to decide whether it is an appropriate forum or whether a British court will assume that function. See Transcript of proceedings, January 27, 1983, where counsel for defendants stated (at pp. 16–17) that "the point of forum non conveniens ... [is an issue which] we want ... decided by the English court and not by the American court." This Court is aware of no precedent, and none has been cited by any party, holding that a *forum non conveniens* claim is to be decided by the tribunal to which a defendant wishes to have an action transferred rather than by the court in which the action is pending.

## V

The conflict here is far from being a dry, abstractly legal dispute between jurisdictions or courts—that is the least of it. Plaintiff has represented that in 1981 one in seven passengers flying between the United States and the United Kingdom was using low-fare Laker;[47] today, by contrast, travellers using scheduled airlines must pay the fare set by the IATA. According to the complaint, this result was brought about because several of the most powerful airlines of the western world banded together to commit violations of the American antitrust laws, engaging in activities which had the effect of driving Laker out of business and of injuring American consumers, among others, by making it impossible for them to continue to benefit from low airfares over the North Atlantic route.

If the allegations of the complaint are true, but if United States courts are nevertheless prevented by the actions of a foreign tribunal from deciding these cases under American law,[48] transatlantic airfares are likely to be kept artificially inflated by the alleged cartel on a permanent basis.[49] Such a development would every year cost many thousands of American travellers hundreds of dollars each, and it would significantly injure American tourism and other businesses which depend upon or make substantial use of commercial air transport between the United States and Europe.

Now that lawsuits are pending which are designed to determine whether the charges of law violations have merit, the defendant airlines have taken steps which, whatever the intention, would have the effect of aborting these actions so that they could never be decided.[50] Clearly, this

---

**45.** *E.g.,* the IATA meeting in Florida.

**46.** Although the defendants represent that all of them are either subject to process in Great Britain or would submit to British jurisdiction, this has not yet been demonstrated.

**47.** Transcript of hearing, March 4, 1983. At the same hearing, plaintiff asserted that President Carter had hailed Laker's service as a breakthrough for the American consumer. Laker had 17,000 agents in this country selling tickets to American travellers.

**48.** It cannot seriously be questioned that British conspiracy laws, to the degree that they may be applicable at all, provide little, if any, protection from anticompetitive activities. See pp. 1136–1137 *infra.*

**49.** The allegations of wrongdoing by the defendant airlines are so significant that the De-

partment of Justice has commenced a grand jury investigation of their activities vis-a-vis Laker. See Aviation Daily at 311 (February 29, 1983), a citation submitted to the Court in the papers filed here.

**50.** In addition to their efforts in the United Kingdom, the defendants, represented as they are by large and prestigious law firms, have sought to disqualify Laker's own counsel. The effect of that effort, if fully successful, would be to leave Laker unrepresented. The disqualification motion, which raises serious and substantial claims, is pending and will be considered by the Court in due course. Defendants have also refused to participate in any meaningful discovery, and they have requested that the Court excuse them from discovery until the disqualification motion is decided. That request is being denied this date by a

Court has an obligation to see to it that the cases before it are disposed of in accordance with law, and it intends to discharge that obligation.

It is to be hoped that the court in Great Britain will ultimately decide that it has no basis for interjecting itself into ongoing foreign lawsuits,[51] or that those who sought or have indicated their intention to seek an injunction in the British court will, upon reflection, proceed by way of normal litigation procedures here.[52] In any event, for the reasons stated, should these injunction cases be required to go forward, it is likely that plaintiff will prevail on the merits of its request for a permanent injunction. See note 20 supra.

## VI

What remains to be considered is the balance of injuries and the public interest.

It is clear that, if this Court does not issue an injunction to preclude the defendants from joining British Airways, British Caledonian, Swissair and Lufthansa in their actions in the British court, at least some of them, or more likely all of them, will do just that. KLM and Sabena have acknowledged their desire to join the British suits; the American defendants disavow any present intention to sue in the British courts but state that they may wish to "participate" in the proceedings there. Given the advantages to antitrust defendants of having the merits of antitrust claims adjudicated in the United Kingdom rather than in the United States (see infra), there is a strong likelihood that all defendants would move in the British courts as soon as they would be legally free to do so.

Defendants argue that even if this forecast is accurate, plaintiff would still not be injured because the British court may decide that Britain is not the only proper forum for Laker's claims and may decline to issue a permanent injunction restraining the proceedings here. If the British court does proceed to the merits of the allegations, they continue, it may be expected to grant just relief, either under the United States antitrust laws or the British conspiracy laws.[53] These predictions can only be characterized as a mirage.

It is quite clear that no British tribunal could or would proceed to enforce the Sherman Act. 15 U.S.C. § 15 lays venue only "in any district court of the United States." Cf. General Investment Co. v. Lake Shore & Michigan Southern Ry. Co., 260 U.S. 261, 287, 43 S.Ct. 106, 117, 67 L.Ed. 244 (1922) (state court may not hear claim brought under antitrust laws; right to sue to be "exercised only in a 'court of the United States' "). The problems that would be involved in trying to prove American antitrust law for purposes of application by a foreign court are reason enough for a foreign court to decline to hear such a case.[54]

Moreover, given the hostility of the British courts to the American antitrust laws, see infra, it would be wholly unrealistic to assume that a British court would enforce

---

separate order. And, as has been noted elsewhere, the defendants are seeking in various ways to defer the decisions of this Court while they are proceeding at a rapid pace before the court in Great Britain.

**51.** It would be a far different and less serious matter had the airlines limited their prayer for relief in the British court to a declaration of British antitrust law. Then the issue would become purely one of the res judicata effect to be accorded the judgment first obtained. See Restatement (Second) of the Law of Judgments § 98.

Similarly, were the lawsuits in this Court to result in a judgment in plaintiff's favor after trial, this Court would have no business interfering with the British courts' application of

British law regarding treble damage awards. See pp. 1137–1138 infra.

**52.** Obviously, if there are jurisdictional or other defects in Laker's lawsuit with respect to any, or all, defendants, this Court is obligated by law, and it will, enforce the defendants' rights in that and in all other respects. Beyond that, appellate courts and appellate remedies are fully available to any dissatisfied party.

**53.** Some defendants focus on the American antitrust laws, others assert that the British laws provide comparable relief.

**54.** American law would have to be proved by the roundabout method of testimony by expert witnesses.

the Sherman Act even if it had legal power to do so.

Confining Laker to British law is equally inadequate. The House of Lords has ruled twice, once in 1891 and again in 1982, that under British law it is not unlawful for a corporation to monopolize commerce by offering exceptional terms resulting in losses so as to drive competitors out of business, with the expectation that the losses will be recouped later once the competitor has been eliminated. These decisions further hold that the crux of an unlawful conspiracy is an intent to injure the plaintiff, and that an agreement or combination which has as its purpose the protection of the interests of the defendants, whatever they may be, is not unlawful. See *Lonhro Ltd. v. Shell Petroleum Co. Ltd.,* [1982] A.C. 173, 189 (1981); *Mogul Steamship Co., Ltd. v. McGregor, Gow & Co.,* [1982] A.C. 25, 35–6, 40 (1891). In these critical respects, British law is thus totally different from American law,[55] and it is plain that to relegate Laker to British law as applied by the British courts would only be to ensure that those courts would issue the declaration of non-liability that the airlines which are already before the Queen's Bench are presently seeking.[56]

Such a result is quite consistent with the way in which British law, both parliamentary and judge-made, regards antitrust principles in general. The Protection of Trading Interests Act of 1980 directs British courts not to enforce treble damage awards against British firms, and this same act's "clawback" provision allows non-United States firms doing business in the United Kingdom to sue there to recover two-thirds of treble damage awards levied against them in the United States. British courts have long bemoaned what they regard as the wrongful extraterritorial reach of the American antitrust laws. See, *e.g., British Nylon Spinners Ltd v. Imperial Chemical Industries Ltd.,* [1953] 1 Ch. 19 (Court of Appeal, 1952).

In short, the situation is not that British law might be slightly less favorable to plaintiff than American law,[57] and that therefore Laker cannot be deemed to be truly injured if it is left to its remedies in the British courts. See note 59 *infra.* Rather, it may be expected that, if this Court should fail to issue an injunction and thus allow those defendants which are still before this Court to join with their alleged coconspirators before the Queen's Bench Division, the British court may very well (1) enjoin Laker from pursuing its remedies against any of the defendants in this Court,[58] and (2) enter a judgment on the merits that the defendants here (plaintiffs there) are not liable to Laker for the acts averred in the complaints.[59] The Court

---

55. See, *e.g., United States v. American Telephone & Telegraph Co.,* 524 F.Supp. 1336, 1368 (D.D.C.1981), citing 3 Areeda & Turner, Antitrust law, ¶ 771b, at p. 151 (1978).

56. Counsel for the defendants make much of a statement made in the *Midland* case by Mr. Justice Parker that "if the alleged conspiracy did exist and Midland was a party to it there would clearly be a cause of action in conspiracy here where Laker could recover full compensatory damages." Transcript of Judgment, February 4, 1983, p. 13. The British court makes no reference to any cases. The phrasing, moreover, would seem to state a tautology: if Midland is found to have engaged in the sort of conspiracy that British law will penalize, then British law will penalize it. The statement does nothing to allay the indication that British law, unlike American law, would not penalize the sort of conspiracy alleged by Laker.

57. Laker might well be entitled to an injunction to protect its American antitrust rights even in that situation, on the basis that it simply cannot be deprived of those rights by the kind of procedural maneuver resorted to by defendants.

58. It is obviously not certain that the British court will do so, particularly with respect to the American parties. However, given the fact that, once the British court issues an injunction of the type sought before it, it may very well be too late for Laker ever to find its way back to the American judicial system, less than absolute certainty concerning the British court's intentions suffices to support a finding of irreparable injury.

59. The fact that another country's law may be less favorable to a plaintiff than is American law is not reason alone to refuse to dismiss a lawsuit on *forum non conveniens* grounds.

finds that, for these reasons, plaintiff would be irreparably injured if the Court does not issue an injunction.

The defendants argue that they will suffer irreparable injury if an injunction is granted. Sabena states that if "forced to defend itself against Laker's claims in the United States, it will be exposed to the risk of enormous potential liability, the possible use of 'escalating settlement' tactics by the plaintiffs, substantial litigation expense, and a significant disruption of its affairs." Memorandum at 15. It observes that "[a]ll of these undesirable consequences can be avoided if the British courts determine that Laker may not lawfully pursue its claims against Sabena in the United States. None of them can be recouped if Sabena is prevented from obtaining such a ruling." KLM makes a similar argument.

A court of the United States can have little sympathy with such a position. If Sabena and KLM are concerned about the prospect of United States antitrust liability they should not do business here.[60] On the other hand, if they feel strongly that they are immune from the antitrust laws for some reason, or that this Court should decline to exercise its subject matter jurisdiction in this case, they may legitimately be expected to follow the established American procedures and file appropriate motions to that effect. Their proper remedy is not to assume the existence of a "right" to go into the courts of a third country so as to circumvent American substantive and procedural law.[61]

The irreparable injury claimed by the American defendants consists of their being prevented "from protecting their rights by participating, or even providing evidence, in the ongoing English proceedings whose outcome may well reflect on the American defendant's own potential liability, if any, under English law." This injury is purely speculative at this point. Moreover, as noted *infra* (note 63), the Court will entertain a proposal by the American defendants to modify the order.

For the foregoing reasons, the Court finds that the injury to Laker from a denial of the injunction far outweighs the injury to defendants resulting from its issuance. Considerations of the public interest also favor the plaintiff. Laker alleges that numerous American consumers were injured by the defendants' predatory acts that led to its demise and with it the alternative of low-cost, no frills transatlantic air service. The public interest clearly favors a full airing of these claims in the manner envisioned by the Sherman Act.

## VII

The Court exceedingly regrets that it must issue an injunction in this case. However, it is worth emphasizing that this Court had no part in precipitating the current dispute. The lawsuit pending before it was proceeding in its normal course,[62] when the British court, without appropriate regard to principles of comity, proceeded to interfere with that action. At that juncture, this Court's options were severely limited. It could either issue its own injunc-

---

*Piper Aircraft v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). But when "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in the law may be given substantial weight." 454 U.S. at 254, 102 S.Ct. at 265. See also, *Industrial Investment Development Corp. v. Mitsui Co.,* 671 F.2d 876, 890–91 (5th Cir.1982), *vacated on other grounds,* —— U.S. ——, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983).

**60.** If this consequence be viewed as an undue burden on U.S. commerce, the remedy, if a remedy is needed, lies with the Congress.

**61.** Absent congressional action, surely a foreign corporation cannot expect that it may do business here but be entitled at the same time to retreat to the sanctuary of a foreign legal system as soon as its conduct of business in the United States involves what are claimed to be violations of United States laws. Only diplomatic personnel have that privilege.

**62.** Defendants have argued that no weight should be given to the fact that Laker won the "race to the courthouse." There was no such race. The Laker suit had been pending for three months before defendants brought any action in the United Kingdom.

tion to prevent at least the remaining defendants—those from the United States and some of those from the European continent—from seeking shelter from United States law in a British court, or it could acquiesce in silence in the effort to have a foreign tribunal decide on this Court's jurisdiction and to see the plaintiff's Sherman Act rights dissipated. With regret, the Court has no choice but to follow the former course.

For the reasons stated, a preliminary injunction [63] was issued [64] restraining the defendants from taking any action in a foreign forum that would impair or interfere with the jurisdiction of this Court in these cases or the freedom of plaintiff to prosecute these actions.[65]

**63.** Several defendants have complained about the breadth of plaintiff's injunction request. In response, plaintiff cogently argues that it is difficult to draft language which would relieve defendants' complaints yet would not provide them with the opportunity, on one basis or another, to proceed in the British court aggressively rather than defensively, as have several other airlines. See, for example, the request of the American defendants to "participate" in the British action without specifying what that participation would entail. If the parties are able to agree on language, or if any party will submit language which will accomplish the objective of permitting the defendants to offer defenses in Great Britain without at the same time leaving them free to secure orders which would interfere with the litigation pending in the United States, the Court will consider modifying the terms of the preliminary injunction.

**64.** See *Seattle Totems v. National Hockey League,* 652 F.2d 852, 855 n. 5 (9th Cir.1981); 28 U.S.C. § 1651 (All Writs Act).

**65.** It is necessary to deal separately with the British court's order to preclude plaintiff from filing motions or pleadings in this Court with respect to its pending action against British Airways. Even if it be assumed *arguendo,* and contrary to what has been stated above, that a court in the United Kingdom has the power to enjoin a British subject from initiating and pursuing a legal action of this kind in the United States, such a court cannot, on any theory, be assumed to possess either the power to issue an order precluding a party to an action in this Court from routine participation in that action, or the capacity to enforce such an order against parties admittedly subject to this Court's *in personam* jurisdiction.

Since Laker is not unwilling, but merely unable, to act, it may ultimately become appropriate to appoint a receiver or trustee to protect its interests and possibly those of American creditors pending final resolution of this controversy. *Cf.* Rule 17(c), Fed.R.Civ.P.; 3A *Moore's Federal Practice* ¶ 17.26; *In re Air Crash Disaster Near Saigon, Etc.,* 476 F.Supp. 521 (D.D.C.1979); *Field v. American West African Line, Inc.,* 154 F.2d 652 (2d Cir.1946). In the interim, to preserve the status quo, the Court expects plaintiff's counsel, as officers of this Court, with professional responsibilities, to continue to represent Laker's interests in the action pending here, notwithstanding the March 2 order against Laker, and to take such measures, including the filing of motions and oppositions, as may be necessary or appropriate to protect these interests.