LAKER AIRWAYS LIMITED, Plaintiff,

v.

PAN AMERICAN WORLD AIRWAYS, et al., Defendants.

LAKER AIRWAYS LIMITED, Plaintiff,

v.

SABENA, BELGIAN WORLD AIR-WAYS, et al., Defendants.

LAKER AIRWAYS LIMITED, Plaintiff,

v.

UNION DE TRANSPORTS AERIENS, et al., Defendants.

Civ. A. Nos. 82–3362, 83–0416 and 83–2791.

United States District Court, District of Columbia.

Nov. 17, 1983.

Robert M. Beckman, Beckman & Farmer, Washington, D.C., for plaintiff.

Carl W. Schwarz, Metzger, Shadyac & Schwarz, Washington, D.C., for defendants.

Fred D. Turnage, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for Pan American World Airways.

Leonard N. Bebchick, Douglas E. Rosenthal, Sutherland, Asbill & Brennan, Washington, D.C., for British Caledonian Airways.

James J. Murphy, Bryan, Cave, McPheeters & McRoberts, Washington, D.C., for McDonnell Douglas Corp. McDonnell Douglas Finance Corp.

George T. Manning, Chadbourne, Parke, Whiteside & Wolff, Washington, D.C., for Trans World Airlines.

Lloyd Cutler, Wilmer, Cutler & Pickering, Laurence A. Short, Short, Klein & Karas, Washington, D.C., for Lufthansa German Airlines, Swissair, Swiss Air Transport Co. Ltd.

Sidney S. Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., for British Airways Bd.

Bert Rein, P.C., Washington, D.C., for Intern. Air Transport Ass'n.

Peter J. Nickels, Covington & Burling, Washington, D.C., for Societe Anonyme Belge D'Exploitation de la Navigation Aerienne (Sabena).

Robert B. von Mehren, R.C. Ferrara, Debevoise & Plimpton, Thomas Whalen, Condon & Forsyth, Washington, D.C., for KLM Royal Dutch Airlines.

Sanford C. Miller, New York City, Haight, Gardner, Poor & Havens, Washington, D.C., for Union de Transports Aeriens.

Robert R. Gray, Hale, Russell & Gray, Washington, D.C., for Scandinavian Airlines System.

Stephen J. Pollak, Shea & Gardner, Washington, D.C., for amicus curiae.

## MEMORANDUM

### I

HAROLD H. GREENE, District Judge.

Laker Airways, a transatlantic air carrier now in liquidation, filed an action in this Court (C.A. No. 82–3362) on November 24, 1982, against six major airlines[1] and two other corporations,[2] charging them with a predatory scheme to drive it out of business, in violation of the Sherman and Clayton Anti-trust Acts, 15 U.S.C. §§ 1, 2, 15.[3] Two months later, on January 21, 1983, four of the defendants—British Airways, British Caledonian Airways, Lufthansa, and Swissair—without notice either to plaintiff or to this Court, and without having raised any issue in this Court regarding jurisdiction—filed a suit in the High Court of Justice, Queen's Bench Division in England (hereinafter referred to as the "Queen's Bench") seeking to enjoin Laker from continuing its action in this Court. They also applied for and were immediately granted, *ex parte*, an injunction against any interference with the English proceedings.

Thereafter, Laker sought and, following full briefing and argument, this Court granted injunctions restraining those de-fendants which had not yet appeared in the English courts from securing orders similar to those which the Queen's Bench had issued on January 21, 1983. See *Laker Airways Ltd. v. Pan American Airways*, 559 F.Supp. 1124 (D.D.C.1983).[4] The Court subsequently considered the issue of the appropriate forum for the dispute between the parties—again with the benefit of full briefing and argument—and it concluded, on the basis of generally accepted principles of *forum non conveniens*,[5] that the controversy was properly triable in this Court. *Laker Airways Ltd. v. Pan American World Airways*, 568 F.Supp. 811 (D.D.C.1983).[6]

### II

In the meantime, British Airways, British Caledonian Airways, Lufthansa, and Swissair kept pressing their claim before the Queen's Bench that the controversy should be resolved in the English courts rather than those of this nation. However, on May 20, 1983, Mr. Justice Parker of the Queen's Bench issued a lengthy and thoughtful opinion in which he held that jurisdiction was properly laid in this Court, and that there was no basis for English judicial interference.[7] Accordingly, he proceeded to dissolve his earlier injunctive or-

1. Pan American World Airways, Trans World Airlines, Inc., British Airways Board, Deutsche Lufthansa Aktiengesellschaft, Swiss Air Transport Company Limited, and British Caledonian Airways Limited.

2. McDonnell Douglas Corporation and McDonnell Douglas Finance Corporation.

3. Subsequently, four other airlines were added as defendants in two additional lawsuits, as follows: on February 15, 1983, Laker brought an action similar to No. 82–3362 against Sabena, Belgian World Airlines and KLM Royal Dutch Airlines (C.A. No. 83–0416) and on September 22, 1983, it brought suit against Union de Transport Aeriens and Scandinavian Airlines System (C.A. No. 83–2791). The defendants in all three actions will generally be referred to herein as the "major airlines."

4. KLM and Sabena appealed this decision to the U.S. Court of Appeals for the District of Columbia Circuit. That appeal is pending.

5. See, *e.g.*, *Piper Aircraft v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Industrial Investment Development Corp. v. Mitsui Co., Ltd.*, 671 F.2d 876 (5th Cir.1982), *vacated on other grounds*, —— U.S. ——, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983).

6. As explained in the Opinion, the Court's decision was based *inter alia* on the following factual and legal considerations: that the plaintiff's choice of forum should normally be respected; that the hub or primary locus of the alleged conspiracy is the United States; that only two of the defendants are British; that foreign courts lack jurisdiction to enforce the American antitrust laws; and that Great Britain provides no remedy for the alleged violations.

7. Mr. Justice Parker observed *inter alia* (Transcript of Proceedings at p. 32) that although Parliament had extensively dealt with certain aspects of American antitrust actions, "it has not said that such [actions] shall not be pursued." By contrast, the U.S. Congress has directed, by its enactment of the Sherman and Clayton Acts, that such actions may be brought here.

ders. The two British airlines took an appeal to the English Supreme Court of Judicature, Court of Appeal (hereinafter referred to as the "Court of Appeal"), and that tribunal first reinstated the injunctions on a temporary basis and ultimately, on July 26, 1983, granted the permanent relief requested by the airlines.[8]

The Opinion of the Court of Appeal, authored by Sir John Donaldson, Master of the Rolls, duly acknowledged that this Court has jurisdiction of the instant controversy:

> First let it be said, and said loud and clear, that no one has ever suggested that the United States District Court is without jurisdiction to try Lakers' complaint against the appellants both under the Sherman and Clayton Acts and in respect of the commission of an intentional tort. Both appellants carry on business in the United States of America sufficiently to make them amenable to the jurisdiction of its courts. If any such submission had been made, it would have been rejected out of hand.

Transcript of Proceedings of July 26, 1983, at p. 4.

The court went on candidly to acknowledge that "the reported authorities do not disclose any case in which consideration has ever been given to restraining the prosecution of proceedings in a foreign court when, as here, there is no alternative English forum before which the same, or substantially the same, right could be asserted," and that, accordingly, its decision was "the first occasion" upon which this had

ever been done. Transcript of Proceedings, at pp. 5, 32.

Having said all that, and much more, the Court of Appeal issued an order flatly enjoining Laker from proceeding with its action in this Court against the British airlines or permitting anyone else to do so on its behalf.

The Court of Appeal judgment is broader even than this necessarily brief recitation suggests, in two respects.

First, by its reasoning and on the basis of the authority which is said to support it (see Part III *infra*), the decision applies not merely to Laker's lawsuit against the British companies; it also prohibits Laker from proceeding in this Court against non-British corporations, *i.e.*, Lufthansa and Swissair.[9]

Second, the decision provides for detailed involvement of the English tribunals in the conduct of the litigation here, albeit on a carefully selective basis, to the end that the English courts may, depending upon the tactical situation, allow Laker to file some pleadings in this Court and prohibit it from filing others. Thus, on October 19, 1983, the Queen's Bench issued an injunction, based upon the Court of Appeal judgment, restraining Laker from "taking any further steps" in this Court or "commencing or prosecuting any other proceedings" against Lufthansa or Swissair,[10] but it exempted from that prohibition one matter—proceedings concerning the motion filed by the major airlines in this Court to disqualify Laker's counsel.[11]

---

**8.** English injunctions restraining the proceedings in this Court have thus been in effect since January 21, 1983—a period of almost ten months.

**9.** But for the pendency of this Court's injunctions against the other defendants (see p. 350 *supra*) the order of the English court would presumably prohibit Laker from proceeding in the courts of this country against any of the defendants.

**10.** On October 21, 1983, Mr. Justice Parker vacated this order, but only on the ground that he had "seen nothing which convinces me that if this relief is not granted at the present time—

and I stress those words—injustice will be done to [German Lufthansa and Swissair]." Accordingly, the judge agreed to permit discovery to proceed in this Court with regard to the German and Swiss corporations for the time being.

**11.** The flavor of the proceedings before the English courts and the degree of interference their actions have encouraged are exemplified by a proposal made to the Queen's Bench by Lufthansa and Swissair that Laker be ordered to withdraw from the files of this Court a motion to compel discovery and to docket instead a stipulation for an extension of time; by advice from Lufthansa and Swissair to the English court regarding the priority with which various

In short, the English injunctions are as broad and intrusive as they are unprecedented.

### III

The decision of the Court of Appeal rests upon orders—so-called General Directions—issued in June of this year by the English Secretary of State for Trade and Industry. After referring to the pendency of this civil action and of a grand jury investigation, and to the possibility that commercial documents and information not within the territorial jurisdiction of the United States might be required to be produced in connection with these American proceedings, the Secretary directed that (Directions of July 1, 1983):

> Except with the consent of the Secretary of State no person or persons in the United Kingdom shall comply, or cause or permit compliance, whether by themselves, their officers, servants or agents, with any requirement to produce or furnish to the United States' Department of Justice, the grand jury or the District Court any commercial document in the United Kingdom or any commercial in-

formation which relates to the said Department of Justice investigation or the grand jury or District Court proceedings.[12]

In a separate order issued on the same date, the Secretary prohibited any "person in the United Kingdom who carries on business there" from complying with any requirement or prohibition imposed pursuant to the United States antitrust laws that would contravene the Secretary's general orders.[13]

The Court of Appeal determined that, under the Secretary of State's directions, the major airlines would be unable to furnish information to this Court or to the plaintiff relevant to the instant actions; that this would hinder the airlines in their defense; and that the appropriate remedy was to enjoin Laker from continuing with the prosecution of its lawsuit.[14] And that is what the court proceeded to do.

Following entry of the Court of Appeal judgment, Laker applied for further review by the House of Lords. The Court is advised that the House of Lords has recently granted such review; that its decision on the merits is not likely to be issued for

---

motions shall be decided by this Court; and by expressions from these airlines incorporated in countries located on the European continent that this United States court not be allowed "to issue orders that may come into conflict with orders issued by [the English courts]." Affidavits and other papers submitted by Stephen Franklin Black, a member of the Bar of this Court, on October 21, 1983. See also Transcript of Proceedings of the same date.

**12.** As authority for his order, the Secretary of State relied upon the Agreement between the United Kingdom and the United States Concerning Air Services, signed in Bermuda on July 23, 1977 (generally referred to as Bermuda 2). It is not necessary, at this juncture, to inquire into the soundness of that reliance. Suffice it to say that there appears to be a dispute between the governments of the two countries on the question of whether enforcement of the United States antitrust laws is in conflict with Bermuda 2, and what remedies, if any, are appropriate in case such a conflict does exist. The answers to these questions must, of course, be decided by the tribunal having jurisdiction of the underlying controversy. See Part IV *infra.* Mr. Justice Parker found no basis for concluding that a conflict existed between the application of Unit-

ed States antitrust laws and the Bermuda 2 agreement, and that the alleged events constituting the "final blow" to Laker—pressure on the non-airline McDonnell Douglas—had no conceivable relevance to Bermuda 2. Transcript of Proceedings of May 20, 1983 at pp. 36, 41.

**13.** In yet another order, the Secretary generously gave his consent to the production of documents and information to United States courts by airlines incorporated in the United States (*i.e.,* Pan American and TWA).

**14.** The "bootstrap" or circular nature of the decision from the point of view of international law and relations is apparent. A court of the United States is prevented from proceeding because the defendants in the American lawsuit allegedly cannot fairly establish their defense here. But the *English* court which reached this conclusion did so not on the basis of any act of this Court or of any party to the proceedings, but rather on the basis of a decision made by an *English* official. To add to the circularity, the possibility of action by the Secretary of State seems to have been originally raised as an option by the Master of the Rolls, the author of the Court of Appeal judgment. See Transcript of Proceedings on March 30, 1983, at pp. 9, 13.

many months; and that the Court of Appeal injunction will remain in effect during the interim.

## IV

■ As a consequence of the English proceedings, the situation before this Court is as follows. This Court, by its own decision and by the decision of the two English tribunals which have passed on the issue, has jurisdiction over the controversy—a conclusion which would appear obvious in any event because (1) the lawsuit involves alleged violations of United States laws (the Sherman and Clayton Acts), jurisdiction over which is expressly vested by Congress in the federal district courts (15 U.S.C. § 15), and (2) the English courts do not try antitrust claims, let alone antitrust claims arising under American law. The Court likewise plainly has jurisdiction over the parties because all of them did at the time of the alleged violations—and indeed do today—conduct business in the United States.

■ Having jurisdiction of the parties and the subject matter, the Court also has exclusive jurisdiction to decide two ancillary issues: first, the effect, if any, of the Bermuda 2 agreement on this litigation (see note 12 *supra*); and second, what remedies are appropriate if the order of the English Secretary of State prevents Laker, the major airlines, or both, from producing the necessary documents.

As concerns the first of these issues, the United States Constitution itself provides in Article VI that

... all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land .... [15]

As arbiters of United States law, the federal courts have long exercised their responsibility of interpreting treaties and examining their impact in legal disputes.

■ Similarly, the federal courts have often had occasion to decide the question of what action is appropriate in cases where documents located abroad are not discoverable due to the compulsion of foreign authorities.[16] A foreign court, which lacks jurisdiction over the underlying controversy, has no valid basis whatever for displacing the decision-making authority of the United States courts with regard to any of these questions.

■ Moreover, the decision of the English tribunal is premature and therefore improper even on its own terms. No one can know at this time what documents located in Great Britain, if any, will ultimately be needed in this litigation, nor can it be predicted that the English Secretary of State will not authorize the release of the necessary documents at the appropriate time (as he has the authority to do under his own charter). Thus, the English Court of Appeal is asserting the right to abort this litigation because documents *may* be needed which *may* not be made available under the Secretary of State's directions, and because the nonproduction of the documents *may* harm the major airlines more

---

**15.** Mr. Justice Parker recognized this principle when he stated that

> [i]t is possible that under American law[,] Bermuda 2 becomes part of that law without further enactment. If this is right, the American courts will decide whether its effect is to grant anti-trust exemption or not. It may be that the American courts will so hold, in which case the anti-trust claim will fail. If they do not so hold, then, if other conditions are established, it will succeed.

Transcript of Proceedings of May 20, 1983, at p. 35.

The federal courts are, of course, likewise not infrequently called upon to construe executive agreements with foreign governments, and to decide on their impact in the context of litigation. *Dames & Moore v. Reagan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937).

**16.** See *e.g., Societe Internationale v. Rogers,* 357 U.S. 197 (1958); *United States v. Vetco, Inc.,* 691 F.2d 1281 (9th Cir.1981); *Civil Aeronautics Board v. Deutsche Lufthansa Aktiengesellschaft,* 591 F.2d 951 (D.C.Cir.1979); *In re Westinghouse Electric Corp.,* 563 F.2d 992 (10th Cir.1977).

than Laker. To state that proposition is to demonstrate its speciousness.[17]

## V

A variety of significant interests are seriously threatened by the English decisions.

First, and most obviously, a plaintiff who is properly in this Court seeking to vindicate his rights under the laws of this nation is being prevented, contrary to normal international usage, from pursuing his legal remedies here. Second, Laker Airways is in liquidation and its most important asset may be the instant lawsuit against these defendants which, according to the complaint, forced it into liquidation.[18] There are likely to be American creditors of Laker who, by the actions of the English officials, may be deprived of any possibility of recovering on their claims notwithstanding that the United States Constitution and laws grant them substantial rights in that regard. Third, this Court, and the appellate courts which have the power to review its decisions, are being deprived of their legitimate jurisdiction by the combined actions of the English judicial and executive officials. Fourth, the English actions may drain the United States antitrust laws of their vitality [19] with respect to multinational corporations, a growing form of industrial and commercial organization, centralization, and power. If the present lawsuit is aborted, it should not be difficult for other cartels or conglomerates in any line of commerce or industry to duplicate in England or elsewhere the interplay of executive and judicial action which brought about such a result here.[20]

## VI

The Court has concluded that in these unusual circumstances—where substantial legal interests are at stake but one of the parties is prevented from asserting its position as a consequence of the intrusion of foreign courts and foreign executive officials into the United States judicial process on bases that, at least *prima facie*, do not appear legitimate—it should not simply sit by and permit these interests to be dissipated by default. To do so would be unjust, and the Court, acting as a court of equity, should prevent such injustice if possible.[21]

During the pendency of the English proceedings, the processes of this Court have been essentially at a standstill. This is due in part to the precarious position of Laker which risks another order, followed by a possible contempt citation, with every paper it files in this Court, and in part to the

---

17. The theories underlying the efforts in and by the English courts to halt the proceedings in this country against the major airlines have undergone substantial shifts during the past ten months. First it was claimed that only the English courts, as distinguished from the courts in this country, have jurisdiction; then it was said that the English courts are to be preferred over the tribunals of the United States under the doctrine of *forum non conveniens;* still later this was changed to an alleged conflict between United States antitrust laws and the Bermuda 2 agreement; this was followed, subsequent to Mr. Justice Parker's order adverse to the major airlines, by the intervention of the English Secretary of State; and the current rationale is, as noted, that the defendants cannot receive the documents necessary for a fair trial in the United States because of the Secretary's order. Only one theme has remained constant: United States courts must not be allowed to pass on the merits of Laker's antitrust claims.

18. The complaint seeks over $1 billion in damages.

19. The major airlines are providing many flights daily to and from the United States, and they are selling thousands of tickets to the American public through hundreds of outlets in the United States. If the English actions achieve their intended result, these airlines will continue to conduct substantial business in this country without the slightest sanction, in spite of the fact that, according to an unresolved complaint, they have been and are in violation of United States law.

20. The potential injury to the American consuming public from such a development is obvious. Whatever may be the views of the English or other foreign authorities on this matter, United States public policy is firmly opposed to monopolies and cartels.

21. See 1 J. Pomeroy, A Treatise on Equity Jurisprudence § 217 (5th ed. 1941) ("the insufficiency and inadequacy of the legal remedies to meet the requirements of justice ... constitute the foundation of the ... jurisdiction of equity").

fact that this Court, in the interest of comity, has deliberately taken no action, for a period of some ten months now, which might precipitate a conflict with the English courts.[22] However, as explained above, those courts have not felt so constrained.[23] Accordingly, because of the passage of time; the additional delays inherent in the proceeding before the House of Lords; the increasing intrusiveness of the English orders; and this Court's obligation to proceed with litigation within its jurisdiction, the Court has concluded that the time has come to end the paralysis and to proceed with these lawsuits.

Since the crux of the problem is that, as a consequence of the actions of the English officials, the adversary process before this Court has broken down, and there is now no one to articulate any public or private interests other than those which the English tribunals permit to be articulated, the solution, it appears to the Court, is to reconstruct that process as best as that can be done under these circumstances.

The most urgent and fundamental first step toward that end is the establishment of a method by which the Court may receive recommendations regarding the means for reviving these lawsuits. The Court cannot depend for that on the parties. The plaintiff is prevented from presenting its views to the Court, and defendants have limited themselves to advocating that all aspects of this controversy, whatever their posture, should be left to the English courts. As for the Court itself, it cannot act on its own, not only because it lacks the necessary facilities (*e.g.*, for the investigation of such matters as the presence of American creditors and the magnitude of their interests) but also, and more importantly, because, consistently with our system, the issues should be explored and briefed independently, and those briefs should then be responded to by the parties, before the Court renders a final decision.[24]

The Court has therefore decided to appoint an *amicus curiae* to act as a "friend of the court" in the most basic and original sense of that term to assist the Court in the restoration of the integrity of the litigation process. Stephen Pollak, Esq., a distinguished lawyer and a former president of the District of Columbia Bar,[25] has kindly agreed, at the Court's request, to accept this assignment. The *amicus* is hereby requested to undertake the necessary investigations of fact and law to assist the Court in determining what action by the Court is required or appropriate in light of

---

**22.** Thus, in spite of criticisms leveled by the major airlines in the English courts that American procedures are too slow (see 559 F.Supp. at 1128 n. 12), and their concurrent insistence that they were anxious "for a resolution of their dispute with Laker *in England* at the earlier possible date" (transcript of Proceedings of October 21, 1983) (emphasis added), this Court granted innumerable requests, induced by the English orders, for postponing the discovery mandated by the Federal Rules of Civil Procedure, and it has taken no action *sua sponte* to move the litigation along. Indeed, in the interest of avoiding a conflict, the Court has refrained from exercising its authority over the members of its own Bar who, in compliance with the English orders, have failed to carry out their obligations here. Compare 559 F.Supp. at 1139 n. 65.

The Court still has no wish to preempt the jurisdiction asserted by the English tribunals, including the House of Lords. The course of action the Court has chosen is calculated to achieve that end: it is unlikely that the pretrial proceedings (including any briefing in connection with the report of the *amicus*), and the trial, should there be a trial, will be concluded before the decision of the House of Lords is issued. The Court's course is also designed, however, to prevent the preemption of the jurisdiction of the courts of the United States by the actions of the English tribunals.

**23.** The view of the English courts appears to be that, even though this Court has jurisdiction over the controversy, conflicts are best avoided if the proceedings in England are allowed to take their normal course while proceedings in the United States are halted until the English courts have rendered their final decisions. See generally, transcript of proceedings before the Queen's Bench of October 21, 1983.

**24.** This is so particularly since, due to the unprecedented actions of the English courts, the issues will necessarily be novel.

**25.** Mr. Pollak is also a former Assistant to the President and a former Assistant Attorney General, and he is now a partner in the law firm of Shea and Gardner.

the decisions of the English authorities and the resulting incapacity of the plaintiff.

The Court has previously indicated that it might consider the appointment of a trustee or receiver to conduct the litigation on behalf of the plaintiff to the extent that the plaintiff is incapable of representing its own interests. See 559 F.Supp. at 1139 n. 65. The *amicus* may wish to explore that option, including such practical issues as the method of appointment and compensation, the powers of such a trustee, and the like. The *amicus* might also consider what relationship, if any, should be established with the Department of Justice or the Department of State to enlist their cooperation or assistance. Additionally, the *amicus* might explore whether it is possible to alleviate the concern of the English courts and executive officials that documents secured as a result of civil discovery in these lawsuits will subsequently be used for grand jury purposes. See, *e.g.*, Mr. Justice Parker's judgment of May 20, 1983, at pp. 25–27.

These subjects are listed herein only for illustrative purposes. The *amicus* will make his own determination as to what steps, if any, are appropriate, given the fact that equity must have "a certain power and freedom of action" to adapt old doctrines "to new relations, and shape ... remedies to new circumstances...." 1 J. Pomeroy, *supra*, § 60 at 78.

When the report of the *amicus* is presented to the Court, all the parties, plaintiff as well as the defendants, will, of course, be given full opportunity to comment thereon, both in writing and at a hearing, before the Court takes further action with respect thereto.