LAKER AIRWAYS LIMITED, Plaintiff,

v.

PAN AMERICAN WORLD AIRWAYS, INC., et al., Defendants.

LAKER AIRWAYS LIMITED, Plaintiff,

v.

SABENA, BELGIAN WORLD AIRWAYS, et al., Defendants.

LAKER AIRWAYS LIMITED, Plaintiff,

v.

UNION DE TRANSPORT AERIENS, et al., Defendants.

Civ. A. Nos. 82–3362, 83–0416 and 83–2791.

United States District Court, District of Columbia.

Dec. 20, 1984.

Robert M. Beckman, David M. Kirstein, Beckman & Kirstein, and William H. Barrett, Carl W. Schwarz, Metzger, Shadyac & Schwarz, Washington, D.C., for plaintiffs Laker Airways Limited.

Douglas E. Rosenthal, Willard K. Tom, John R. Munich, Stephen Yale-Loehr, Karen L. Grimm, Sutherland, Asbill & Brennan, and Leonard N. Bebchick, Washington, D.C., for British Caledonian Airways Limited.

Sidney S. Rosdeitcher, Todd D. Stern, Peter Buscemi, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., and William C. Clarke, Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for British Airways Board.

## OPINION

HAROLD H. GREENE, District Judge.

This is an antitrust action brought by Laker Airways (Laker) against a number of American and foreign airlines. Presently before the Court is Laker's motion for an injunction to restrain British Airways Board Ltd. (British Airways) and British Caledonian Airways (British Caledonian) from petitioning the British Parliament or the British executive authorities to enact legislation which would prohibit Laker, under threat of criminal punishment, from continuing with this lawsuit. For an understanding of the issues, it is appropriate, at the outset, to summarize the course of this litigation to date.

### I

On November 24, 1982, Laker brought an action in this Court under the Sherman Act (15 U.S.C. §§ 1 and 2) and the Clayton Act (15 U.S.C. § 15) against four American defendants and four foreign airlines.[1] On February 15, 1983, Laker brought a second action, this one against Sabena Belgian World Airlines (Sabena) and KLM Royal Dutch Airlines (KLM), and on September 22, 1983, a third action was filed, naming Union de Transports Aeriens (UTA) and Scandanavian Airlines System (SAS) as defendants. All three actions, which have since been consolidated, allege that the defendants were involved in a conspiracy to destroy Laker's transatlantic charters and its low-cost "Skytrain" service through a predatory pricing scheme and through interference with Laker's attempts to obtain necessary financing. It is further alleged that, as a result of this conspiracy, Laker was forced into liquidation.

On January 21, 1983, British Airways filed an action against Laker in the Queen's Bench Division, Commercial Court of the High Court of Justice, in Great Britain, seeking a permanent injunction[2] to prevent Laker from continuing with its suit against British Airways in the United States.[3] Im-

---

[1]. The American defendants are Pan American World Airways, Inc., (Pan Am), Trans World Airlines, Inc. (TWA), McDonnell Douglas Corporation (McDonnell Douglas), and McDonnell Douglas Finance Corporation (McDonnell Finance). The initial foreign defendants were British Airways, Deutsche Lufthansa Aktiengesellschaft (Lufthansa), Swiss Air Transport Company Limited (Swissair), and British Caledonian.

[2]. The action also sought a declaration of non-liability to Laker.

[3]. An earlier declaratory judgment action had been filed against Laker in the same court by Midland Bank PLC. Midland brought the action in anticipation of being named a defendant in the proceedings before this Court, and it sought a declaration that it was not party to any unlawful combination and was not liable in connection with the events which led to the

mediately thereafter, British Caledonian, Lufthansa, and Swissair filed similar actions in the British courts.

The British High Court of Justice issued the requested injunctions, restraining Laker from taking "any further steps" to prosecute its claims in the courts of this country against the British airlines [4] or against Lufthansa and Swissair.[5]

Faced with the *fait accompli* injunctions obtained by four of the defendants to this lawsuit, and concerned that the remaining defendants might take similar actions to frustrate the jurisdiction of this Court and Laker's ability to maintain its suit, this Court, upon Laker's request, enjoined the remaining four defendants—TWA, Pan Am, McDonnell Douglas, and McDonnell Douglas Finance—"from taking any action, in a foreign court or otherwise, that would in any way impair or otherwise interfere with the jurisdiction of this Court over the matters alleged in the Complaint herein or the freedom of the plaintiff to prosecute the instant proceeding." The Court subsequently issued essentially the same order against Sabena, KLM, UTA and SAS.[6] *Laker Airways Ltd. v. Pan American World Airways*, 559 F.Supp. 1124 (D.D.C. 1983). Sabena and KLM—but not the other defendants—appealed, claiming that this Court had no authority to restrain them from seeking orders in the British courts to prevent Laker from further prosecuting this lawsuit. However, the Court of Appeals affirmed this Court's decision in an exhaustive opinion which thoroughly discussed all the issues and canvassed all the relevant legal principles. *Laker Airways v. Sabena Belgian World Airways*, 731 F.2d 909 (D.C.Cir.1984).

While these matters were being litigated in this country, the litigation initiated by some of the defendant airlines continued in the British courts. The British Court of Appeal, on July 27, 1983 issued a permanent injunction against Laker restraining it from taking further proceedings in this Court, and that injunction effectively blocked Laker from even filing pleadings, briefs, or other papers in this, its own lawsuit. The Court of Appeal injunction also ordered Laker to use its best endeavors to dismiss British Airways and British Caledonian Airways from this litigation.

However, the House of Lords granted Laker's petition for leave to appeal, and on July 19, 1984, it overruled the Court of Appeal and dissolved the injunction which that court had issued. To forestall another round of applications and orders in Great Britain, Laker, immediately following the House of Lords decision, requested this Court to issue an injunction against the two British airlines similar to that which the Court had previously entered against the other defendants.

In response to Laker's motion, the Court entered a temporary restraining order, prohibiting the defendants from taking steps

---

collapse of Laker. Midland sought and obtained an *ex parte* interim injunction which restrained Laker *inter alia* from "instituting or continuing legal proceedings against [Midland] whether in the United States (whether as defendant to the Civil Action now proceeding in the United States District Court for the District of Columbia between Laker Airways as plaintiff and Pan-American World Airways Inc. and others as defendants, or otherwise) or elsewhere, other than in the Courts of England for relief or otherwise in any way in connection with any alleged unlawful combination or conspiracy ...." On February 4, 1983, this injunction was continued pending trial in Midland's case. According to Laker's briefs, this injunction is still in effect to this day, and a hearing on Laker's request to have it lifted will not be held until May 15, 1985.

4. Mr. Justice Parker of the High Court, who originally issued the injunctions, vacated them after a hearing, on March 29, 1983, but one day later they were reinstated pending appeal by order of the Master of Rolls.

5. The injunctions against Laker with respect to Lufthansa and Swissair expired on October 21, 1983, but these two airlines continue to seek permanent injunctions and declaratory relief in their British actions. Laker is still enjoined by the British courts from seeking any order in the action in this Court which would prevent Lufthansa and Swissair from proceeding with their British suit. Laker Response Brief at 2–3.

6. The injunction against UTA and SAS prohibited action "before a foreign court or any other foreign government authority."

in a foreign court "or otherwise" that would impair the jurisdiction of this Court, and the parties subsequently extended the terms of that order by stipulation until October 9, 1984. On October 5, 1984, the Court heard oral argument on the proposed preliminary injunction which was to give more permanency to the temporary restraining order but to retain that order's language.

In their briefs and in oral argument, British Airways and British Caledonian focused on the "or otherwise" language of the proposed injunction, claiming that it impermissibly infringed their right to seek relief from the British executive and legislative branches. Recognizing that this argument raised a complex question, the Court issued a temporary injunction only so as to preserve the status quo pending further briefing of the issue. 596 F.Supp. 202. Subsequently, in response to a request from British Airways, the Court agreed to set an expiration date of December 20, 1984, nine days after oral argument, on the status quo injunction. It is the "or otherwise" issue that is presently before the Court.[7]

## II

■■■ As is obvious from this chronology, the current controversy has its roots in the previous attempts of British Airways and British Caledonian—successful for about one and one-half years—to frustrate the jurisdiction of this Court and to interfere with Laker's right to free access to the courts of this nation.[8] Rather than to defend this action in the normal, accepted manner,[9] these two defendants have consistently preferred to seek interdictory relief elsewhere. As the Court of Appeals has noted, they did not attempt to vindicate their legal arguments in a forum of competent jurisdiction but rather "to quash the practical power of the United States courts to adjudicate claims under United States law against defendants admittedly subject to the court's adjudicatory jurisdiction." *Laker Airways Ltd. v. Sabena, supra,* 731 F.2d at 938.

One result of this unusual conduct of the defendants has been the generation of significant delays in the progress of this litigation. In November 1983, this Court noted that, during the pendency of the English proceedings, its processes in regard to this case were effectively at a standstill, both because of the British injunctions then pending against Laker and because of this Court's own determination, out of respect for considerations of comity, to avoid conflict with the British courts.[10] Delays in production of discovery materials have been commonplace, since some of the airlines based in various foreign countries, or the governments of those countries, decided to follow the lead of the British interference by relying upon foreign blocking stat-

7. Defendants do not contest the Court's power to issue the injunction if the "or otherwise" language is deleted.

8. The British airlines engaged in this effort notwithstanding the fact that both they and Laker have long conducted business in this country, and that they continue to do business here on a significant scale, enjoying the protection of American law and the American courts for their business enterprises which include landing rights, ticket offices, and advertising campaigns addressed to millions of Americans.

9. The proper procedure for determining whether a court has the authority to hear a particular case is, of course, a challenge to jurisdiction filed in that court followed, if necessary, by appeals to higher tribunals. *United States v. United Mine Workers,* 330 U.S. 258, 291, 67 S.Ct. 677, 694, 91 L.Ed. 884 (1947); Federal Rules of Civil Procedure, Rule 12(b); Wright, Law of

Federal Courts § 16 (1976). Furthermore, as the Court of Appeals has noted, "a defendant's claims that foreign law forbids a foreign national from prosecuting a United States antitrust action should be made initially in the United States District Court free from the coercive threat of a possible antisuit injunction." *Laker Airways v. Sabena, supra,* 731 F.2d at 939 n. 110.

10. *Laker Airways v. Pan American Airways,* 577 F.Supp. 348, 354–55 (D.D.C.1983). To end this paralysis, the Court ultimately appointed an *amicus curiae* to advise on the steps that might be taken to proceed with the lawsuit in the face of Laker's disability. The report of *amicus curiae* was filed February 28, 1984. In view of the action of the House of Lords, it has not been necessary to consider further that report and its recommendations.

utes, and they thus achieved non-compliance with the Federal Rules governing discovery.[11] The sum total of these activities has changed the quality of this lawsuit from a garden-variety type of antitrust suit [12] into one involving an "unprecedented foreign challenge to the application of the antitrust laws." [13]

Ultimately, some of these problems were resolved by the decision of the House of Lords. That tribunal concluded that this was a case in which "there is a single forum only that is of competent jurisdiction to determine the merits of the claim; and that single forum is a foreign court. For an English court to enjoin the claimant from having access to that foreign court is, in effect, to take upon itself a one-sided jurisdiction to determine the claim upon the merits against the claimant but also to prevent its being decided upon the merits in his favor." *British Airways Board v. Laker Airways*, [1984] 3 W.L.R. 413, 420, H.L.(E). As the House of Lords further explained, Laker, British Airways, and British Caledonian "voluntarily submitted themselves to a regulatory regime which, as far as their operations within the territorial jurisdiction of the United States were concerned, required that each of them should become subject to American domestic law including American antitrust law." *Id.* at 424. On this basis, Britain's highest tribunal rejected the claims of British Airways and British Caledonian that they had a right not to be sued by Laker in a foreign court, or conversely, that Laker, as a British corporation, had no right to bring suit against them,[14] and it concluded that the two British airlines had no right to an injunction preventing the United States courts from adjudicating this case.

The judicial branches of both the United States and the Great Britain have thus now reached the same conclusion with respect to this litigation: this Court is the only forum of competent jurisdiction; it is the only forum in which Laker may present its substantive claims; and it is the only forum in which British Airways and British Caledonian Airways may present whatever defenses they may have.

The British defendants now state that they will not seek further injunctions in foreign courts and that they are prepared to litigate this case in this forum.[15] Having said that, however, these defendants are now embarked upon yet another extraneous and disruptive effort: the attempted use of the British Parliament and the British executive authorities as means for aborting this lawsuit. It is defendants' claim on the present motion that, by forbidding them from taking action in a foreign court "or otherwise" that would interfere with the jurisdiction of this Court, the injunction would permissibly prevent them from requesting the British Parliament or the British executive authorities to enact legislation which would stop Laker, once again, from further prosecuting this lawsuit.[16]

The legal issues presented by the British defendants with respect to this matter are discussed below. However, the Court cannot help but observe that, considering both their actions in this litigation thus far and

---

**11.** The English Secretary of State issued orders and directives under the Protection of Trading Interests Act to prevent disclosure of documents related to this case. Protection of Trading Interests (U.S. Antitrust Measures) Order 1983, June 27, 1983. Several other defendants have filed motions for protective orders seeking denials of discovery based upon various foreign blocking statutes. See Opinion of this Court on Lufthansa Discovery, June 26, 1984.

**12.** *Laker Airways v. Pan American Airways, supra,* 559 F.Supp. at 1131.

**13.** *Laker Airways v. Sabena, supra,* 731 F.2d at 946.

**14.** Indeed, the House of Lords explicitly noted that there was nothing unconscionable or unjust in Laker's conduct in pursuing its cause of action in the United States court.

**15.** Opposition of Defendant British Airways Board to Plaintiff Laker Airways Limited's Motion for Preliminary Injunction at 2; Opposition of Defendant British Caledonian at 3.

**16.** The only such legislation specifically mentioned by defendants is a statute making it a criminal offense under British law for Laker to continue with this action.

their present effort at obstruction, the tenacity of these defendants in seeking a resolution of this lawsuit everywhere but in the appropriate legal forum is remarkable and probably unprecedented.

## III

■ Before discussing specifically the legal arguments presented by the parties, it is useful to consider exactly what interests are at stake in this litigation and, more specifically, in this motion for preliminary injunction. As has already been indicated; it is clear that this Court has a strong interest in protecting, indeed a duty to protect, its jurisdiction to the extent necessary to provide full justice to litigants. *Laker Airways v. Sabena, supra,* 731 F.2d at 927. This duty has its basis in Article III of the Constitution and in Congress' grant to the federal district courts of original jurisdiction in civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331.

■ In addition to this general interest in maintaining the judicial authority in conformity with jurisdictional law, this case raises the question of the proper enforcement of the antitrust statutes of the United States. The Congress has clearly established the public policy importance of these laws as a centerpiece of economic and commercial relations in this country, and for that reason these laws have often been referred to as the Magna Carta of economic freedom. See, *e.g., United States v. Topco,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972). It is very clear that, absent statutory exemptions, all entities within the jurisdiction of the United States are required to comply with these laws (see note 8, *supra*), and that the courts have the duty to enforce the rights accruing thereunder when appropriate complaints are filed.

This case, moreover, involves allegations of breaches of the antitrust laws on a substantial scale. According to Laker, many domestic and foreign corporations participated in a vast antitrust conspiracy which resulted in the demise of an international airline; a potential loss to Laker's investors and creditors of almost $250 million; [17] and higher transatlantic fares to thousands, if not millions, of United States (and other) travellers.

■ The injury to Laker, as well as to United States citizens, whether creditors or consumers, emphasizes the importance of yet another factor—Laker's right to petition in this Court for the redress of *its* grievances. Aliens and foreign corporations such as Laker which are injured by antitrust violations occurring within the jurisdiction of the United States have the right to sue in the courts of this nation just as have American citizens. *Pfizer Inc. v. India,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). Laker's right to bring this suit and the Court's obligation to hear it are buttressed by the constitutional mandate which guarantees to all those residing or doing business in the United States due process of law and the equal protection of the laws. *Plyler v. Doe,* 457 U.S. 202, 212, 102 S.Ct. 2382, 2392, 72 L.Ed.2d 786 (1982), quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Laker Airways v. Pan American,* 559 F.Supp. at 1134. Foreign directives which prevent Laker from suing in this Court deny to that plaintiff these basic rights.

Against these strong interests which would sustain an order by this Court to prevent further interference with this lawsuit from any source, defendants advance three arguments: (1) an injunction of the type sought by Laker would be inconsistent with the First Amendment to the Constitution; (2) such an injunction would violate accepted standards of international law; and (3) the Court should refrain from issuing an injunction under principles of international comity. Each of these arguments will now be considered in turn.

17. The magnitude of the alleged injury is, of course, a significant factor in evaluating the importance of maintaining the jurisdiction of this Court, the only forum available for redress of these injuries.

## IV

Defendants argue most vigorously that Laker's requested injunction would violate their right, guaranteed by the First Amendment, to free speech and to petition the British government for the redress of their grievances. That argument is not well taken, for two basic reasons.

First. The question here under consideration is that of the Court's power, consistent with the First Amendment, to enjoin defendants' proposed activities. Thus, defendants' arguments necessarily assume that, even though their proposed speech and petitioning activities will occur in Great Britain, not here, they are nevertheless protected from the injunction requested by Laker by the umbrella provided by the Constitution. In other words, what the defendants are saying is that they have a right under the Constitution of the *United States* to petition the authorities of another country—*Great Britain*—for the redress of grievances—on the face of it a remarkable claim.

 It is well settled that the Constitution restrains not only the power of the federal government to act in this country but in many respects also its power to affect American citizens in foreign countries.[18] It is less clear, however, whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad;[19] whether the petitioning of foreign governments is at all activity protected by United States law;[20] and what United States constitutional protections aliens residing elsewhere may draw on when affected by American governmental action.[21]

However, no court has held—at least no decision has been cited to this Court and the Court has found none—that a United States tribunal is compelled by the First Amendment to protect an alien's desire to speak in a foreign country or to petition the governmental authorities of a foreign nation. More significantly perhaps, there is no law or precedent supporting the proposition that, when a United States court proposes to take what would clearly be lawful action, it is required[22] to refrain from doing so because the action will deprive an alien of speech and petitioning rights vis-a-vis a foreign government.

What all this adds up to is that defendants could prevail on their First Amend-

---

**18.** See, *e.g., Johnson v. Eisentrager,* 339 U.S. 763, 769, 70 S.Ct. 936, 939, 94 L.Ed. 1255 (1950); *Reid v. Covert,* 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1224–1225, 1 L.Ed.2d 1148 (1957); *United States v. Toscanino,* 500 F.2d 267, 280 (2d Cir.1974).

**19.** See *Haig v. Agee,* 453 U.S. 280, 308, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981). At least one commentator has suggested that the Bill of Rights acts as a check on conduct only in cases where official actions have affected persons physically. See Note, The Noerr-Pennington Doctrine and the Petitioning of Foreign Governments, 84 Col.L.Rev. 1343, 1353 (1984).

**20.** In *Eastern R.R. President's Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court held that, in view of First Amendment protections, the Sherman Act does not apply to activities which comprise solicitation of governmental action with respect to the passage and enforcement of laws. See also *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). However, it has been held in a number of cases that the Noerr-Pennington doctrine does not apply to the petitioning of foreign governments. See *Coastal States Mar-*

*keting, Inc. v. Hunt,* 694 F.2d 1358 (5th Cir. 1983); *Bulkferts Inc. v. Salatin Inc.,* 574 F.Supp. 6 (S.D.N.Y.1983); *Australia/Eastern U.S.A. v. United States,* 537 F.Supp. 807, 812 (D.D.C. 1982); *Dominicus Americana Bohio v. Gulf and Western,* 473 F.Supp. 680, 690 n. 3 (S.D.N.Y. 1979); *Occidental Petroleum Corp. v. Buttes Gas and Oil Co.,* 331 F.Supp. 92 (C.D.Cal.1971), *aff'd,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). See also Note 19, *supra,* at 1343.

**21.** Foreign law may, of course, grant such rights. But what is at issue here are rights under United States law. By doing business here, defendants voluntarily made themselves subject to United States jurisdiction and to the application of United States domestic law and, as parties before the Court, they are entitled to the protection of that law—nothing less but also nothing more. See *Laker Airways v. Pan American World Airways, supra,* 559 F.Supp. at 1134.

**22.** As to the question whether the Court should consider the foreign nation's interests with respect to the particular subject as a matter of international comity, see Part VI *infra.*

ment argument only if this Court broke new constitutional ground. There is hardly a warrant for doing so in a case where the new doctrine is sought to be invoked as a means for defeating established constitutional and other rights as well as jurisdiction protected by United States law.

Second. Defendants' First Amendment argument suffers from what may be an even more fundamental flaw, in that it ignores the basic question at issue here: would an order directing defendants not to request the British government to take action designed to interfere with the jurisdiction of this Court be violative of First Amendment principles? Analysis demonstrates that the answer must be in the negative.

■■■ We begin with the proposition, which cannot seriously be contested, that freedom of speech is not absolute. Certain types of speech are not protected by the First Amendment, including such matters as libelous statements,[23] a false cry of fire in a crowded theater,[24] fighting words,[25] and obscenity.[26] Other types of speech are given only limited First Amendment protection, e.g., commercial speech,[27] and speech mixed with conduct.[28]

■■■ More directly. to the point, the First Amendment clearly does not protect speech which interferes with the fair and unhindered administration of justice. Thus, this constitutional provision does not protect contempt of court even if that contempt takes the form of speech;[29] it does not protect the right to picket in front of a courthouse;[30] it does not prevent the court from enjoining litigants and lawyers from communicating with the press;[31] and, even more directly to the point, it does not protect against a so-called antisuit injunction, that is, an order by a court having jurisdiction directing a litigant before it not to apply to a foreign court for an order which would interfere with the first court's jurisdiction.[32]

**23.** *E.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**24.** *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (establishing the clear and present danger test for restrictions on free expression).

**25.** *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

**26.** *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

**27.** *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S.· 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

**28.** *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *O'Brien v. United States,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

**29.** *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974).

**30.** *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

**31.** *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 601, 96 S.Ct. 2791, 2823, 49 L.Ed.2d 683 (Brennan, J. concurring); *Sheppard v. Maxwell,* 384 U.S. 333, 361–63, 86 S.Ct. 1507, 1521–22, 16 L.Ed.2d 600 (1966).

**32.** The right to litigate is clearly protected under the First Amendment's guarantee of free speech and the right to petition. *United Mine Workers of America v. Illinois State Bar Association,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972); *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam). However, as, for example, the Court of Appeals has previously noted in this case, there are many precedents for antisuit injunctions. *Laker v. Sabena, supra,* 731 F.2d at 927–31; *Seattle Totems Hockey Club, Inc. v. National Hockey League,* 652 F.2d 852, 854–56 (9th Cir.1981), *cert. denied,* 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982); *Bethell v. Peace,* 441 F.2d 495 (5th Cir.1971); *In re Unterweser Reederei, GmbH,* 428 F.2d 888 (5th Cir.1970), *rev'd on other grounds sub nom., Bremen v. Zapata Offshore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). ·

The antisuit injunction precedents also dispose of defendants' contention that, whatever may otherwise be appropriate, a court may not interfere with free speech by a prior restraint. An antisuit injunction is, of course, precisely that. See also *Sheppard v. Maxwell, supra,* where the Supreme Court stated that "the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters

This very litigation has, of course, been a prime exhibit demonstrating the antisuit injunction principle. As discussed in Part I, *supra*, the British courts issued several such injunctions, this Court followed suit in 1982, and, as also noted above, this Court's antisuit injunction was upheld both by the U.S. Court of Appeals and, indirectly, by the British House of Lords.

What are the reasons for these exceptions to the free speech principle? The basic rationale for the exceptions related to the administration of justice is that the "unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy," [33] for it is clear that when a court is prevented by outside pressure or other interference from adjudicating claims between litigants before it, the rule of law is significantly impaired. In implementation of these principles, some of the restrictions on speech have been justified as necessary to ensure a fair trial of issues before the court, [34] others as appropriate to protect the forum's jurisdiction to provide a full and fair adjudication of the claims, [35] and still others "to assure that the administration of justice at all stages is free from outside control and influence." [36]

All this is so well established that it may be regarded as hornbook law. What remains to be considered, however, is whether the Court has the authority, consistent with the First Amendment, to enjoin the particular kind of interference with the ad-ministration of justice that is being threatened by these defendants.

 Here, too, we may begin with what is clearly established. Defendants' threatened action—to apply to the British Parliament or other British governmental authorities for the enactment of legislation that would make it impossible for Laker to continue to litigate here—*would have no purpose other than to interfere with the jurisdiction of this Court.* Must the Court nevertheless allow defendants to proceed? Defendants answer in the affirmative, pointing again and again, in various ways, to what they assert is a direct parallel: a petition by a United States citizen or corporation to the United States Congress, requesting the enactment of legislation either to alter the substantive law under which the court is proceeding, [37] or to deprive the court of jurisdiction over the particular class of cases. [38]

Certainly, this Court would be without power to interfere by way of an injunction with petitioning or lobbying for that kind of legislation. Yet the Court is convinced [39] at the same time that it does not lack such power with respect to the petitioning of the British Parliament. The difference between the two situations is not attributable to any assumption that the United States Congress possesses, somehow, an intrinsically higher status than the British Parliament—of course it does not.

---

...; any statements made ... to officials; the identity of prospective witnesses or their possible testimony; any belief in guilt or innocence; or like statements concerning the merits of the case." 384 U.S. at 361, 86 S.Ct. at 1522.

**33.** *Cox v. Louisiana, supra,* 379 U.S. at 562, 85 S.Ct. at 479; *Wood v. Georgia,* 370 U.S. 375, 383, 82 S.Ct. 1364, 1369, 8 L.Ed.2d 569 (1962).

**34.** *Sheppard v. Maxwell, supra,* 384 U.S. at 361–63, 86 S.Ct. at 1521–23; *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242 (7th Cir.1975).

**35.** *Laker Airways v. Sabena, supra,* 731 F.2d at 929. This factor is particularly important where, as here, this Court is the only available forum for the vindication of the substantive rights at issue.

**36.** *Cox v. Louisiana, supra,* 379 U.S. at 562, 85 S.Ct. at 480.

**37.** *E.g.,* in this instance, an amendment of the antitrust laws.

**38.** There continues to be debate over the exact parameters of congressional power to withdraw jurisdiction from the federal courts. See, *e.g.,* Wright, Law of Federal Courts § 10 (1976); *Battaglia v. General Motors Corp.,* 169 F.2d 254, 257 (2d Cir.1948).

**39.** There is no case authority directly on point—a circumstance which defendants make much of. The reason no such authority exists is simple: until now no one appears to have embarked upon so bold and unusual a scheme to vitiate existing jurisdiction.

The real difference between the two bodies in the present context is that the Congress, *because it makes the laws under which this Court operates*, would be exercising legitimate power were it to pass legislation with respect to these laws, while the Parliament—which has no role with respect either to United States substantive law or to federal court jurisdiction—would be improperly interfering with the jurisdiction of what to it is a foreign court. Needless to say, the principle operates equally in reverse. Thus, the Congress could not arrogate to itself the power to interfere with the legitimate jurisdiction of a British court by enacting legislation prohibiting either that court or the plaintiff before it from proceeding; and if it attempted nevertheless to do so, the British courts would not be bound to respect its status or its interference.[40]

 That difference—between a petition to the United States Congress with respect to a matter pending before a federal court and a petition to the British Parliament with respect to a matter before that same [federal] court—may be analogized to the difference between an appeal from a decision of this Court to the U.S. Court of Appeals for this Circuit, and an effort to overturn or otherwise to nullify such a decision by asking a court in Great Britain (or France or Iran) to abort the action by one means or another.[41] The former is proper, the latter is not.[42]

Since from the point of view of United States law, under which this Court operates, the effect of defendants' proposed legislative and executive petitioning activities could only be an improper interference with legitimate jurisdiction, there is no reason whatever why the Court should regard these activities as more properly clothed with First Amendment protection than defendants' earlier efforts to have the British courts interfere with that jurisdiction.

For these reasons, the Court rejects defendants' reliance on the First Amendment.

## V

Defendants argue next that the injunction sought by Laker would violate fundamental principles of international law and generally-recognized principles of justice. More specifically, British Caledonian states that interference with what they claim are their free speech and petitioning rights would violate such international agreements as the Universal Declaration of Human Rights[43] and the Helsinki Accords.[44] These arguments entirely lack merit.

 It is obvious that international law based upon the "principles of justice generally recognized by states that have reasonably developed legal systems,"[45] does not prohibit a state from balancing free speech and petition rights against other significant rights and interests. There is, for example, nothing in international law or univer-

---

**40.** Indeed, it may be expected that, in such a situation, the United States courts, like the House of Lords, would set parochial concerns aside and act in accordance with legal principle.

**41.** Similarly, at the domestic level, an individual litigant in, say, the Commonwealth of Virginia would obviously not be acting improperly if he sought to have a lower court decision overturned by the legislature or the highest court of that state. However, such a litigant could be prohibited by court order from seeking to achieve that result by application to the legislative body or the courts of the State of Maryland.

**42.** There is yet another distinction between an injunction against domestic lobbying and one against lobbying a foreign government. Both Congress and the President are restricted by Article III and the First Amendment, absent valid legislation, from interfering with a plain-

tiff's right of access to the court (*California Motor Transport v. Trucking Unlimited, supra, Cruz v. Beto, supra*), and attempts to interfere would be subject to review by the Judiciary. No such safeguards attach to successful lobbying of foreign legislative or executive bodies.

**43.** Universal Declaration of Human Rights, U.N. G.A. Res. 217, 3 GAO (A810) at 71, December 10, 1948.

**44.** Final Act of Conference on Security and Cooperation in Europe, 15 International Legal Materials 1295 (1975).

**45.** Opposition of British Caledonian Airways at 32 *quoting* the Restatement (Second) of Foreign Relations Law § 18(b)(iv).

sal principles of justice to preclude a nation from enacting and enforcing laws which punish libel, contempt of court, or speech causing a clear and present danger of injury to other individuals. Compare decisions cited in notes 23 to 32, *supra*. Indeed, numerous British statutes impinge upon free speech far more trenchantly than is customary in the United States or than would occur under the injunction in this case.[16] The Court has not heard defendants argue that all such statutory enactments and judicial decisions, both British and American, are violative of treaties, international agreements,[47] or international law generally.

Properly viewed, therefore, reliance on international law principles adds nothing to defendants' arguments.[48] International law would support defendants' position only if "principles of justice generally recognized by states that have reasonably well developed legal systems" (see note 45, *supra*) were somehow far broader in protecting speech and petition than either the United States Constitution or British law. The very recital of that proposition demonstrates its lack of merit.

The First Amendment to the United States Constitution may well provide the broadest protection to rights of expression known to the civilized world. If defendants cannot make out a violation of free speech or petition rights under that basic constitutional provision, they surely cannot do so under general principles of international law.

## VI

International comity, as the Court of Appeals recently explained in this very case,[49] is the degree of deference a domestic forum should pay to the act of a foreign government not otherwise binding on the forum.

Since comity varies according to the factual circumstances surrounding each claim for its recognition, the absolute boundaries of the duties it imposes are inherently uncertain. However, the central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations. The interests of both forums are advanced—the foreign court

---

**46.** See, e.g., Contempt of Court Act of 1981, 51 Halsbury's Statutes of England 495, permitting courts to enjoin publications, (S. 4(2)–(3)) or to punish by contempt publications, which create a "substantial risk that the course of justice in the proceedings in question will be seriously impeded or prejudiced" (S. 2(2)). This law applies to "any speech, writing, broadcast or other communication in whatever form, which is addressed to the public at large or any section of the public."

The Protection of Trading Interests Act of 1980, 50(1) Halsbury's Statutes of England 258, prevents British citizens and corporations from furnishing or publishing commercial information in foreign proceedings (S. 2(1)).

The Official Secrets Act, 8 Halsbury's Statutes of England 250, makes communication of certain information a crime.

See also, the Criminal Libel Act of 1819, 19 Halsbury's Statutes of England 7, The Libel Act of 1843, *Id.* at 11, and the Defamation Act of 1952, *Id.* at 34.

**47.** British Caledonian's claim that an injunction here would violate the non-intervention principles of the Helsinki Accords illustrates the recklessness of defendants' arguments. The non-intervention principles enshrined in these Accords specifically refer to armed intervention; military, political, or economic coercion against another state; and assistance to terrorist or subversive activities directed towards the violent overthrow of the regime of a participating state. Article VI. It is difficult to fathom on what basis a party might equate any of those proscribed activities with this Court's attempt to maintain its jurisdiction to enforce valid, domestic law with respect to parties properly before the Court. And it is particularly ironic that such an argument is made by a party that has successfully used foreign court intervention to prevent normal judicial processes from operating for a period of some eighteen months.

**48.** Additionally, defendants have cited no international law principles which prohibit the courts of one state from defending its legitimate jurisdiction and laws against interference by foreign governmental action.

**49.** *Laker Airways v. Sabena, supra,* 731 F.2d at 937–55.

because its laws and policies have been vindicated; the domestic country because international cooperation and ties have been strengthened. The rule of law is also encouraged, which benefits all nations.

Comity is a necessary outgrowth of our international system of politically independent, socio-economically interdependent nation states. As surely as people, products and problems move freely among adjoining countries, so national interests cross territorial borders. But no nation can expect its laws to reach further than its jurisdiction to prescribe, adjudicate, and enforce. Every nation must often rely on other countries to help it achieve its regulatory expectations. Thus, comity compels national courts to act at all times to increase the international legal ties that advance the rule of law within and among nations.

731 F.2d at 937 (footnotes omitted).

Although it is clear, for reasons which this Court and the Court of Appeals have previously explained, that comity does not require this Court to relinquish its jurisdiction over this action, to permit a foreign court to interfere with that jurisdiction, or to accede to orders of foreign governmental entities which are contrary to United States public policy,[50] it does not follow that comity considerations are irrelevant to the dispute raised by the instant motion.

■■■■ British Airways and British Caledonian are subject in their operations not only to the jurisdiction of the United States but also to that of the Great Britain. Indeed, these defendants owe their very corporate existence to British law, they are regulated by various British executive authorities, and one of them (British Airways) is owned by the British government. In such a situation, it is appropriate for the Court to consider whether, notwithstanding its power to enjoin these corporations from petitioning the British government with respect to the matters involved in this lawsuit, it should refrain from exercising that power in reliance on the principles of comity. See *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir.1979); *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir.1976).

In *Mannington Mills, supra,* the court set forth a number of factors which should generally govern when the issue of international comity is raised in litigation, as follows: (1) the degree of conflict with foreign law or policy; (2) the nationality of the parties; (3) the relative importance to the alleged violation of the conduct here as compared to that abroad; (4) the availability of a remedy abroad and the pendency of litigation there; (5) the existence of an intent to harm or affect American commerce and the foreseeability of such harm; (6) the possible effect on foreign relations if the court exercises jurisdiction and grants relief; (7) the illegality of the act in either country or the imposition of conflicting requirements in the event relief is granted; (8) the ability of the court to make its order effective; (9) the acceptability of the relief in this country if required by a foreign nation under similar circumstances; and (10) the existence of a treaty bearing upon the issue.

Some of these factors are not directly applicable to the issues here and with respect to others, especially the fifth factor listed above, the Court of Appeals has already made a determination that this Court is precluded from recognizing the legitimacy of a foreign court injunction which is designed to harm United States commerce (and indeed United States jurisdiction).[51] There are, however, some considerations involved in the current controversy which were not present, or not present to the same degree, in that which was before the court in *Sabena,* and they point to a different result in the present context.

■■■■ Principal among these considerations is the interest of Great Britain in the political rights of British subjects. It may

---

**50.** *Id.; Laker Airways v. Pan American, supra,* 577 F.Supp. 348.

**51.** *Laker Airways v. Sabena, supra,* 731 F.2d at 939.

reasonably be presumed that Great Britain attaches considerable importance to the existence of these rights, including the right of those within British boundaries to petition the government for the redress of grievances. That right to petition was recognized as long ago as 1215 when the Magna Carta was signed,[52] and it is perpetuated to this day in the Bill of Rights.[53] Having granted these rights, Great Britain obviously has a substantial interest in not having them vitiated. That interest is entitled to respect from the governmental bodies of this nation, including this Court, just as this nation would expect similar recognition by others for the interests of the United States.[54]

The question that naturally arises, then, is how the obligation of this Court to safeguard its interests and those of its litigant Laker may be reconciled with the Court's desire to afford comity to the British interests mentioned above. After carefully considering the matter, the Court has concluded that this objective is best accomplished not by prohibiting these defendants from petitioning their own governmental authorities, but rather by relying on the British government's own responsibilities under the principles of comity.

■ As discussed above, it would be entirely improper for the British governmental authorities, legislative or executive, to enact into law a petition which requested them, in effect, to interfere with the due processes of United States law and the United States courts. Indeed, it is difficult to believe that any civilized nation [55] would enact a law, such as is contemplated by these defendants, which made it a criminal offense for an individual or a corporation to proceed with ongoing litigation in the judicial tribunals of a friendly state.[56] That belief is reinforced in the present situation by the fact that the House of Lords, Great Britain's highest court, has already determined that this Court has jurisdiction over the controversy between the parties, and that it is, in fact and the law, the only appropriate tribunal for the resolution of that controversy.

Because of these considerations,[57] the Court has decided that, rather than to en-

52. Text of Magna Carta reprinted in Perry, Sources of Our Liberty (1978) at 11.

53. The Bill of Rights of 1689 protects "the right of the subjects to petition the King, and all commitments and prosecutions for such petitioning are illegal." See *Id.* at 222, 246.

54. In this regard, the Court regrets to note, however, that Laker is still subject to various injunctions in Britain (see *e.g.,* notes 3 and 5, *supra* ), and that Laker is also seriously restricted in its ability to engage in discovery with respect to this lawsuit as a consequence both of acts of the British government and of those of various other governments which control some of the other defendant airlines. Nevertheless, whatever others may do, this Court will continue to be scrupulous in proceeding in accordance with internationally-recognized principles of comity.

55. One of the factors a United States court may consider in determining whether comity should operate with respect to another nation is whether that nation operates under civilized standards, and whether that nation behaves in a reciprocal fashion towards the United States. *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

56. Criminal legislation is the only type of action by the British government defendants have mentioned in these proceedings. The principles which here apply would, however, be equally applicable if the interference took the form of civil laws or penalties or administrative regulation.

57. The extension of comity in these circumstances is buttressed by the presence here of two other *Mannington Mills* factors: (1) the foreseeability of the harm to United States interests and (2) the effectiveness of an order by this Court in these peculiar circumstances.

As stated above, principles of comity, which apply in Great Britain as they do here, may be expected to restrain British executive and legislative bodies from taking steps to interfere with properly-constituted proceedings in United States courts. Although the British government has some pecuniary interest in the outcome of this case, it may be regarded as unlikely that commercial considerations would lead Britain to ignore considerations of comity and to interfere with what is now the clearly-established jurisdiction of this Court. Thus, harm to United States interests from action in Great Britain is less likely, *i.e.,* less foreseeable.

As for the element of effectiveness, it would obviously be difficult for this Court to police

join these defendants from submitting their petitions to the British authorities, as Laker has requested, it will permit them to do so, confident that the British Parliament and the British executive authorities will not act in a manner at odds with their own obligations under the law of nations and under comity principles.

On that basis, and solely on that basis, the Court will eliminate from the injunction requested by Laker the words "or otherwise," thus permitting the defendants to petition the British legislative and executive authorities.[58] As so limited, the defendants will be enjoined, "subject to further order of this Court, from taking any steps in a foreign court that would in any way impair or otherwise interfere with the jurisdiction of this Court over the matters alleged herein or the freedom of the plaintiff to prosecute the instant proceeding."

---

contacts between these defendants and the British government or to determine who originated those contacts. By contrast, the Court could easily determine whether a defendant filed a lawsuit in the British courts, since such a filing would be an open, discrete act.

58. This course is also appropriate because it does not leave the Court without a remedy if, contrary to all expectations, the British legislative or executive authorities, with or without urging from these defendants, take action or threaten to take action inimical to the Court's jurisdiction. Such a remedy could take the form of the appointment of others (*e.g.,* a receiver, a committee of creditors) to carry on the lawsuit in Laker's place, or it might consist of the imposition of sanctions against the defendants, including, if necessary, a default. See *Laker Airways v. Sabena, supra,* 731 F.2d at 941 n. 118; *Societe Internationale v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *United States v. Vetco,* 691 F.2d 1281 (9th Cir.1981). See also Report of Amicus Curiae, *supra.*